RAYMOND ISMIL AND ANOTHER v. L. H. SOWLES COMPANY AND OTHERS.

203 N. W. 2d 354.

December 22, 1972—No. 43302.

*Meagher, Geer, Markham & Anderson, O. C. Adamson II, Arthur B. Geer,* and *Gaughan & Reid,* for appellant.

*Schermer, Schwappach, Borkon & Ramstead* and *Irvin E. Schermer,* for respondents.

Heard before Knutson, C. J., and Todd, MacLaughlin, and Schultz, JJ.

MacLAUGHLIN, JUSTICE.

This is an action to recover damages sustained by plaintiffs[1] as a result of an industrial accident on February 25, 1970, in the construction of a Control Data Corporation building in Bloomington, Minnesota. Pursuant to the jury's special verdict, judgment was entered for plaintiffs against defendants L. H. Sowles Company and William Grove. Defendant Sowles Company appeals from an order denying its motion for a new trial and from the judgment. We affirm.

The accident occurred while concrete was being poured for the fourth-floor walls of a concrete wind tower. Kraus-Anderson Company, the general contractor, was responsible for the erection of the towers. Plaintiff Raymond Ismil was employed by Kraus-Anderson and was foreman of the crew of concrete work-

---

[1] Plaintiff Raymond Ismil was injured in the accident. Plaintiff Lorraine Ismil is his wife. She alleges that she has been deprived of her husband's consortium, companionship, and conjugal affection.

ers building the towers. Defendant Sowles Company was a subcontractor which, among other things, was to supply and erect the steel reinforcing rods around which the concrete was poured. In order to raise the steel into place, Sowles had a large truck crane on the premises. Although its subcontract did not pertain to the pouring of concrete for the tower, Sowles agreed orally to lease its crane, together with an operator and an oiler, to Kraus-Anderson on an hourly rental basis for the purpose of lifting buckets of concrete to the upper-floor levels of the tower. One Larry Schoening was the very experienced operator and defendant William Grove was the oiler, both when the crane was used for Sowles' purposes and when used for Kraus-Anderson's purposes under the oral agreement. Both men were employees of Sowles. The oiler's job was to service and maintain the crane. He had only minimal experience lifting steel with the crane and, prior to the day of the accident, only 10 minutes' experience lifting buckets of concrete with the crane. There is considerable evidence of his ineptitude in operating the crane. Despite this, he had been authorized to operate the crane by his employer, Sowles.

On the day of the accident, Kraus-Anderson desired to add another story to the wind tower. Sowles was informed of the need for the crane to lift buckets of concrete to the top of the tower, and the crane was positioned by the tower. Raising the bucket to an area generally above the tower was relatively simple, but positioning and lowering the bucket to the precise pouring point required a signalman to direct the operator. The operator of the crane could see the bucket while it was being raised, but when the bucket was over the tower, the tower completely obstructed his vision. He was dependent upon the signalman to indicate where the bucket should be positioned above the tower and when, and how far, the boom and bucket should be lowered down among the workmen on the top of the tower to the pouring point. Plaintiff, as foreman of the concrete crew on top of the tower, ordered defendant Kenneth Hauschild, also a Kraus-Anderson employee,

to act as the signalman. Operated by Schoening, the crane smoothly lifted buckets of concrete to the top of the tower, where Kraus-Anderson employees emptied the bucket into forms which defined the rising walls of the tower. Then Schoening left the crane for his coffee break and instructed the oiler, defendant Grove, to operate the crane. Grove lifted a bucket of concrete over the top of the tower. There is some dispute about the signals given to the oiler by Hauschild, but the jury found the signalman to be free of negligence. The bucket began to drop slowly and then dropped abruptly on plaintiff. Plaintiff was permanently and seriously injured.

Plaintiffs brought this action against Sowles Company, the signalman, Hauschild, and the oiler, Grove. In the special verdict, the jury found Sowles Company negligent in furnishing Grove as operator of the crane and that such negligence was a direct cause of the injuries; they found Grove and Sowles Company were negligent in the operation of the crane and that such negligence was a direct cause of the accident; and they found Hauschild was not negligent. Only defendant Sowles has appealed.

■ Sowles contends that Grove, the oiler, was a loaned servant of Kraus-Anderson as a matter of law under the facts of this case or, at the very least, that the question should have been submitted to the jury. The trial court ruled as a matter of law that the loaned-servant doctrine was inapplicable and instructed the jury accordingly.

Once it is determined that a workman is a servant (employee), it is well established that the master (employer) is subject to vicarious liability for the tortious conduct of the servant which is within the course and scope of his employment. However, if the employee is a loaned servant, the liability for his negligent acts shifts from the general employer to the borrowing employer.

Nepstad v. Lambert, 235 Minn. 1, 50 N. W. 2d 614 (1951), is the leading Minnesota case on the loaned-servant doctrine. In that case two standards are established in determining when a workman has become a loaned servant. The first is the "whose

business" test, in which it is asked: "At the time of the negligent act, which employer's business was being done or furthered?" 235 Minn. 11, 50 N. W. 2d 620. The second is the "right of control or direction" test in which it is asked: "[W]hich employer had the right to control the particular act giving rise to the injury?" 235 Minn. 14, 50 N. W. 2d 621. The question is not whether the worker remains the employee of the general employer as to general matters, but whether, as to the act in question, he is acting in the business of and under the direction of the borrowing employer. Nepstad also held that the directions of the borrowing employer must be commands and not requests if the employee is to be converted into a loaned servant, and that the borrowing employer must have authority to exercise detailed authoritative control over the manner in which the employee is performing the work.

The trial court, in rejecting the loaned-servant doctrine, placed considerable reliance on the fact that Grove, in operating the crane, was under the absolute direction of Kraus-Anderson's signalman only during the final stages of the movement of the crane. The trial court understood Nepstad to require that every movement of the crane from the time it left the ground must be directed by the borrowing employer (Kraus-Anderson). We do not interpret Nepstad so narrowly. The tests of the Nepstad case were sufficiently satisfied by the evidence to compel a jury determination of whether Grove was a loaned servant. The accident occurred in the course of pouring concrete, and that function was clearly the responsibility of Kraus-Anderson. The jury could reasonably have found that the business of Kraus-Anderson and not Sowles was being furthered at the time of the negligent crane operation. Similarly, the jury could find that the acts which led to the injuries were directed and controlled by the signalman, an employee of the borrowing employer. We hold that the trial court erred in determining, as a matter of law, that the loaned-servant doctrine was inapplicable.

However, the error of the trial court became unprejudicial and

harmless when the jury found "defendant L. H. Sowles Company negligent in furnishing the defendant William Grove as an operator of the crane insofar as the qualification and competency of defendant William Grove as an operator was concerned." The jury also found that negligence to be a direct cause of plaintiff's injuries. Sowles has not contested those findings on this appeal.

Even if the jury had found the loaned-servant doctrine applicable, thereby relieving Sowles of vicarious liability for Grove's negligence, Sowles would still be liable to plaintiffs for its direct negligence in furnishing an incompetent operator. We agree with the trial court's summary in his memorandum:

"In any event, the jury found that the defendant Sowles was independently guilty of negligence in furnishing an unqualified operator for the purpose of the work. Such a finding renders the point raised by defendant Sowles moot. It is clear that even if Grove had been a loaned servant of Kraus-Anderson Company so as to exonerate Sowles of vicarious liability for his negligence, the loaned-servant relationship would not have freed Sowles of liability for its negligence in furnishing an operator incapable of performing the work of operating the machine in a reasonably competent and safe manner."

■ The trial court directed a verdict in plaintiff's favor on the issue of contributory negligence. A directed verdict should be granted only in those cases where, in the light of the evidence as a whole, it would clearly be the duty of the trial court to set aside a contrary verdict as manifestly against the entire evidence. Lovejoy v. Minneapolis-Moline Power Implement Co. 248 Minn. 319, 79 N. W. 2d 688 (1956). Sowles argues that the evidence established that the custom and practice of men working under a crane-operated bucket is to keep an alert lookout, and to keep out from under the bucket, and that there were several oral warnings which should have been heeded by plaintiff.

Plaintiff testified that he was operating a vibrator on the decking on the top of the building. The vibrator is about 3 inches

in diameter and 2 feet long. It is operated electrically, and the vibrator head spins in the concrete, forcing the concrete to mix into the rods. Plaintiff testified that there were two vibrators operating at the time, and they oftentimes strike the rods and rattle and are "very noisy."

Plaintiff's job required him to vibrate almost continuously during the time the bucket was lifted and unloaded. He stated as follows on cross-examination:

"Q. And when the bucket would get up on prior occasions would you be in the center of this tower with the rest of the crew?

"A. I would always—I was always vibrating.

"Q. You are always vibrating.

"A. I am always vibrating. On that day especially because the concrete was stiff."

Plaintiff testified as to noise:

"Q. Now, did Mr. Hauschild say anything to you or to the crew before this bucket load of cement came up that the oiler was operating the crane?

"A. I never heard nothing.

"Q. And when the bucket got overhead did Mr. Hauschild tell you the bucket was overhead?

"A. I didn't hear it.

"Q. If he said it you didn't hear it.

"A. I didn't hear it. There is a lot of noise with that vibrator in the wall. I didn't hear nothing."

The signalman, defendant Hauschild, testified on cross-examination concerning his warnings:

"Q. How far away were you from Ray Ismil when you gave the warning?

"A. I suppose three or four feet.

"Q. Did he have ear muffs on?

"A. Well, he could just as well have. That vibrator makes enough noise."

Plaintiff testified about his opportunity to avoid the bucket:
"A. And there is a lot of noise with the vibrating going on. And I was vibrating, and there was a lot of rods in there yet because we didn't have much concrete in the forms. The only thing that I caught, I caught a noise and I just heard a noise that sounded, you know, so different. Like a roar. The first thing I thought of was looking up, straight up. I don't know—there is a lot of airplanes flying over that area, Bloomington, I don't know—I didn't know what it was. I looked up, and I seen the bottom of the hopper. I seen the bottom of the hopper. And it was a split second then. If I could have jumped I would have jumped. I didn't have—you know, just a split second it was all over."

Several of the workmen on the scene testified that plaintiff could not have avoided the bucket. Andrew Schmitz, a member of the concrete crew, related that "there was no possible way for him to get out of the way, even with the warning, because it went too fast." Don William, a carpenter foreman on the top of the tower, testified that he "heard a holler," turned around to see the bucket falling, and said that the plaintiff had no chance to get out from under it. Defendant Hauschild said it happened "so fast I didn't have time to do nothing."

The evidence was overwhelming that plaintiff was not able to keep a lookout because of his duties with the vibrator; could not hear any warnings; and, in any event, was not in a position to escape the bucket when it dropped directly on him. There was no error by the trial court in directing that plaintiff was not negligent.

■ During the trial, Sowles' steel erection subcontract was introduced into evidence by defendant Hauschild with no objection by Sowles. In final argument, plaintiff's counsel referred to a provision in the subcontract stating that Sowles agreed to accept responsibility for damages and injuries to all persons arising out of its negligence on the job. Counsel also pointed out that another provision of the contract required Sowles to carry a certain sum of insurance to cover any such claims.

Sowles contends, no doubt correctly, that the provision in the contract requiring insurance and the assumption of liability referred to liability of Sowles arising out of its steel erection work and not liability arising out of the rental of the crane, which was pursuant to a subsequent oral agreement.

The only objection made by Sowles at the time was that the argument was a misstatement of the contract. No specific objection was made to the reference to insurance. In chambers, the attorney for Hauschild objected to these references by plaintiff's counsel and requested that the court instruct the jury that the contract had no application to plaintiff's claim. Sowles did not join in this request. Nevertheless, the court responded that he would instruct the jury that they were not to consider the contract for any purpose, and proceeded to instruct them to completely disregard the contract because it had no bearing on any of the rights or responsibilities of the parties.

Granting a new trial for misconduct of counsel is a matter largely within the discretion of the trial court, and we will not reverse unless the conduct is so prejudicial that it is a miscarriage of justice to allow the result to stand. Olson v. Prayfrock, 254 Minn. 42, 94 N. W. 2d 540 (1958). Under all of the circumstances, including the instruction to the jury, we find no abuse of discretion by the trial court.

Sowles also questions (a) the trial court's exclusion of certain opinion evidence by an employee of defendant, and (b) the trial court's refusal to admit a signed written statement by Hauschild which allegedly contained impeaching statements. We have carefully considered both contentions and hold that the trial court acted well within its discretion in each instance.

Affirmed.