**George M. TESKA and Darlene Teska, husband and wife, Plaintiffs,**

**v.**

**POTLATCH CORPORATION, a foreign corporation, and Oscar J. Boldt Construction Co., a foreign corporation, Defendants.**

**No. Civ.00-418(RLE).**

United States District Court, D. Minnesota.

Jan. 2, 2002.

Willard Lester Converse, Robert Charles Bell, Jensen Bell Converse & Erickson, St. Paul, MN, for Plaintiffs.

Frank Barry Yetka, Rudy Prevost Gassert & Yetka, Cloquet, MN, Steven Wayne Schneider, Anthony Sullivan Downs, Halverson Watters Downs Reyelts & Bateman, Duluth, MN, for Defendants.

MEMORANDUM ORDER

ERICKSON, United States Magistrate Judge.

I. *Introduction*

This matter came before the undersigned United States Magistrate Judge pursuant to the consent of the parties, as authorized by Title 28 U.S.C. § 636(c), upon the Defendant's Motion *in limine*, and its Motion for Summary Judgment. A Hearing on the Motions was conducted on July 26, 2001, at which time the Plaintiffs George M. Teska, and Darlene Teska, appeared by Robert C. Bell, Esq., and the Defendant Oscar J. Boldt Construction Co. ("Boldt") appeared by Steven W. Schneider, Esq.

For reasons which follow, we grant the Defendant's Motion *in limine*, as well as its Motion for Summary Judgment.

II. *Factual and Procedural History*

The Plaintiffs commenced this action after George M. Teska ("Teska") was injured, at work, on October 28, 1999. At that time, Teska was working as a boilermaker foreman on a project for the Potlatch Corporation ("Potlatch").[1] Potlatch was modernizing its oriented strand board facility, which is located in Cook, Minnesota, and it had hired Boldt as the general contractor. Boldt then subcontracted with The Jamar Company ("Jamar") for certain mechanical installations. See, *Exhibit 1 to Affidavit of Steven W. Schneider* (subcontract agreement between Boldt and Jamar). Teska was employed by Jamar.[2]

On October 28, 1999, a column was to be installed in the heat source area of the project. The column was a seventeen foot I-beam, and the installation of the column was Jamar's responsibility. See, *Deposition of Robert Larson,* at 14, *Exhibit 2 to Affidavit of Steven Schneider* ("Larson Deposition"). As the column was to be positioned vertically, it was necessary to employ a crane so as to move the column into place. For that purpose, Jamar requested the use of a large crane that had been maintained on the site by Boldt. Pursuant to the subcontract agreement, Boldt also provided the crane operator, who was Richard A. Fuglie ("Fuglie"), in conjunction with the crane. See, *Exhibit 1 to Affidavit of Steven W. Schneider.*

The process of securing the column, so that it might be lifted by the crane, is known as "rigging," and it was the boilermakers' responsibility to rig the column at issue here. See, *Larson Deposition,* at 14. According to Robert Larson ("Larson"), who was Jamar's superintendent on the site, it was his responsibility, as well as that of Teska, to ensure that the rigging was performed properly, and he had discussed the safest way to rig the column, with Teska, at some time prior to October 28, 1999. *Id.* at 8–9. Larson believed that it would be "advantageous" to rig the column with a shackle inserted in a hole at the top of the beam, and Teska apparently agreed. *Id.*

Although Teska generally recalls his conversation with Larson, he does not recall communicating Larson's instruction, concerning the use of a shackle, to the remaining members of the boilermaker crew. See, *Deposition of George M. Teska,* at 155–56, *Exhibit 4 to Affidavit of Steven W. Schneider* ("Teska Deposition, Exhibit 4"). Moreover, the boilermaker crew, which was comprised of Timothy Sauter ("Sauter"), and David Kangas ("Kangas"), have testified that they had received no instructions as to how to rig the column. See, *Deposition of David Kangas,* at 13–14, *Exhibit 5 to Affidavit of Steven W. Schneider* ("Kangas Deposition"); *Deposition of Timothy Sauter,* at 15, *Exhibit 6 to Affidavit of Steven W. Schneider* ("Sauter Deposition").

Kangas eventually rigged the column for the lift, using a two-inch nylon sling as his primary rigging device. See, *Kangas Deposition,* at 13. Initially, he attempted to

1. Potlatch was also named as a Defendant in this action, but was voluntarily dismissed as a party, with prejudice, on December 28, 2000. See, *Teska v. Oscar J. Bolt Construction Co.,* Civ. No. 00–418, *Stipulation of Dismissal* (D.Minn. December 28, 2000) [Docket No. 16].

2. Jamar's superintendent on the site was Robert Larson ("Larson"), and Teska was the boilermaker foreman for the project. See, *Deposition of Robert Larson,* at 6, *Exhibit 2 to Affidavit of Steven W. Schneider.* The boilermakers were charged with the installation of the project's furnace. *Id.* at 6. Larson was the highest ranking Jamar boilermaker on the site at the time of the accident, and Teska was next highest ranking boilermaker. *Id.* at 8. Teska's responsibilities included supervising the remaining boilermakers who were installing the furnace, which included Timothy Sauter ("Sauter"), and David Kangas ("Kangas").

rig the column using a "double-wrap," but after the nylon sling was extended, it became apparent that the top of the column would come into contact with the "headache ball," which is a part of the crane-lifting mechanism, *id.* at 14–15, and would cause problems in placing the column as the column would not hang perpendicular to the ground. He then rigged the column with a "single wrap." *Id.* After rigging the column, Kangas consulted Sauter about when they would be ready for the lift, and Sauter questioned whether a shackle should be used for the rigging. See, *Sauter Deposition,* at 15. The two men then decided, however, that a shackle was not necessary. *Id.* at 17. Teska has described both Kangas, and Sauter, as well as himself, as being "all experienced journeymen," *Teska Deposition,* at 35, who would have known the proper way to rig the column on account of their experience as boilermakers. *Id.* at 56.

After the column was rigged, Fuglie was called upon to operate the crane so as to lift the column into place. A portion of the lift, that Fuglie had to make, was a "blind lift." See, *Deposition of Richard Fuglie,* at 16, *Exhibit 7 to Affidavit of Steven W. Schneider* ("Fuglie Deposition"). In other words, there was a period of time during the lift when Fuglie was unable to see the column. *Id.* This "blind" period came at the end of the lift, when he was to position, and place, the column in its designated location. *Id.* To compensate for Fuglie's inability to observe the column during the "blind" portion of the lift, the boilermakers, who were Jamar employees, used hand signals to direct Fuglie. *Id.* Teska located himself at the point where the column was to be positioned, and secured, into place.

Once the column was close to Teska, he then relayed signals to Sauter, see, *Deposition of George Teska,* at 43, *Exhibit 3 to Affidavit Steven W. Schneider* ("Teska Deposition, Exhibit 3"), who had positioned himself where he could see both Teska and Kangas. See, *Sauter Deposition,* at 20. Sauter and Fuglie could not see each other, however. *Id.; Fuglie Deposition,* at 17. As a consequence, Sauter relayed his signals to Kangas, who then passed those signals on to Fuglie. See, *Sauter Deposition,* at 20. Neither Kangas nor Fuglie could see Teska. See, *Kangas Deposition,* at 21; *Fuglie Deposition,* at 17. As the column was brought into position above Teska, and just before Fuglie began to lower the column into position, the column slid through the nylon sling, and fell to the ground. In the process of falling, the column caused the scaffolding, on which Teska was standing, to collapse. During the course of that collapse, Teska suffered numerous injuries, for which he initiated this action.

Teska claims that the rigging of the column, with the "single wrap" nylon sling, was inappropriate for this particular load, and that Fuglie had a duty to challenge the rigging procedure employed by the Jamar boilermakers. Consequently, Teska contends that Fuglie's action, in lifting the column, constituted a negligent act. Accordingly, Teska is suing Boldt on the basis of vicarious liability for the acts of Fuglie. As part of his claim, Teska offers the expert opinion of Gerald Sundboom ("Sundboom"), who expresses the opinion that a reasonably prudent crane operator would not have made the lift, under the circumstances here, because the rigging was not safe. In contrast, Boldt challenges the admissibility of Sundboom's testimony, and also seeks the entry of Summary Judgment, denying any liability, on its part, as a matter of law.

### III. *Discussion*

As noted, in its Motion *in limine,* Boldt challenges the admissibility of Sundboom's expert opinion, under Rule 702, Federal

Rules of Evidence, and it also seeks Summary Judgment on two separate legal theories. First, if we grant Boldt's Motion *in limine,* and exclude the testimony of Sundboom, then Boldt argues that we must grant it Summary Judgment, as the Plaintiffs will be unable to demonstrate that Fuglie owed any duty to Teska, much less that he breached that duty. Second, Boldt urges that Fuglie's work, as a crane operator under the circumstances of this case, falls within the Loaned Servant Doctrine, so as to render him an employee of Jamar, who was also Teska's employer. Should the Loaned Servant Doctrine be found to apply, then, Boldt argues, Teska's claim would be barred by the Minnesota Worker's Compensation Act. See, *Minnesota Statutes Section 176.001 et seq.* Since they invoke distinct legal precepts, and analyses, we separately address Boldt's Motions.

A. *The Defendant's Motion in Limine to Exclude the Testimony of Sundboom.*

The Plaintiff has identified the following as the opinions that Sundboom would express at Trial, were he called to testify:

1. A crane operator should reject a rigging by a nylon sling;
2. The proper way to rig the steel column would have been with a shackle;
3. The crane operator should not have lifted the steel column the way it was rigged.

*Plaintiffs' Responsive Memorandum,* at 5.

According to Boldt, however, Sundboom's opinions do not satisfy the requisites of Rule 702, Federal Rules of Evidence, and they are, therefore, inadmissible.

1. *Standard of Review.* The admissibility of expert testimony is governed, in large part, by Rule 702, Federal Rules of Evidence, which provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*Rule 702, Federal Rules of Evidence* (2001).[3]

As the Supreme Court has explained, "Rules 702 and 703 grant expert witnesses testimonial latitude unavailable to other witnesses on the 'assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.'" *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 148, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), (quoting *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). When evaluating the admissibility of expert testimony, a Court must look to both the relevance, and the reliability, of the proffered testimony. See, *Lauzon v. Senco Products, Inc.,* 270 F.3d 681, 686 (8th Cir.2001), citing *Daubert v. Merrell Dow Pharm., Inc.,* supra at 591–93, 113

3. Rule 703, Federal Rules of Evidence, also imposes the following restrictions on the provision of expert opinion evidence:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted.

*Rule 703, Federal Rules of Evidence* (2001).

S.Ct. 2786; *Bonner v. ISP Technologies, Inc.*, 259 F.3d 924, 929 (8th Cir.2001); *Jaurequi v. Carter Mfg. Co.*, 173 F.3d 1076, 1082 (8th Cir.1999).

"When it comes to admission of expert testimony under the Federal Rules of Evidence, a trial judge has a gatekeeping responsibility to 'ensur[e] that an expert's testimony rests on a reliable foundation and is relevant to the task at hand.'" *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 714–15 (8th Cir.2001), quoting *Kumho Tire Co., Ltd. v. Carmichael*, supra at 141, 119 S.Ct. 1167. "Both the Eighth Circuit Court of Appeals and the Supreme Court have made clear that a person, although qualified as an expert in one area of expertise, may be precluded from offering opinions beyond that expertise, or that are not founded on a reliable methodology." *Smith v. Rasmussen*, 57 F.Supp.2d 736, 766 (N.D.Iowa 1999), citing *Kumho Tire Co., Ltd. v. Carmichael*, supra at 141, 119 S.Ct. 1167.

Ultimately, "it is the responsibility of the trial judge to determine whether a particular expert has sufficient specialized knowledge to assist jurors in deciding the specific issues in the case." *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, supra at 715, 254 F.3d 706, citing *Kumho Tire Co., Ltd. v. Carmichael*, supra at 156, 119 S.Ct. 1167. "Once initial expert qualifications and usefulness to the jury are established, however, a district court must continue to perform its gatekeeping role by ensuring that the actual testimony does not exceed the scope of the expert's expertise, which if not done can render expert testimony unreliable under Rule 702, Kumho Tire, and related precedents." *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, supra at 715.

"[B]efore accepting the testimony and opinion of an expert witness, the Trial court is charged with the 'gatekeeper' function of determining whether the opinion is based upon sound, reliable theory, or whether it constitutes rank speculation." See, *Kemp v. Tyson Seafood Group, Inc.*, 2000 WL 1062105 at *2 (D.Minn. July 19, 2000), citing *Kumho Tire Co. v. Carmichael*, supra at 141, 119 S.Ct. 1167, and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, supra at 589–90, 113 S.Ct. 2786. "Expert testimony that is speculative is not competent proof and contributes 'nothing to a legally sufficient evidentiary basis.'" *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir.2000), quoting *Weisgram v. Marley Co.*, 528 U.S. 440, 454, 120 S.Ct. 1011, 145 L.Ed.2d 958 (2000).

As the Court in *Kumho* made clear, the Trial Court's gate-keeping function is to be employed for all expert testimony. *Kumho Tire Co. v. Carmichael*, supra at 141, 119 S.Ct. 1167 ("We conclude that Daubert's general holding—setting forth the trial judge's general 'gate-keeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge."); see also, *Rule 702, Federal Rules of Evidence, Advisory Committee Notes to 2000 Amendments* ("Consistently with *Kumho*, the Rule as amended provides that all types of expert testimony present questions of admissibility for the trial court in deciding whether the evidence is reliable and helpful.").

Thus, "[i]n order to be helpful to the trier of fact, the witness must be qualified as an expert, the expert must have a reasonable factual basis for their testimony, the testimony must be based on reliable methods, and the testimony must be relevant to the facts at issue." *Kemp v. Tyson Seafood Group, Inc.*, supra at *2. As the Supreme Court, in *General Electric Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512,

139 L.Ed.2d 508 (1997), succinctly observed:

> Trained experts commonly extrapolate from existing data. But nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply to great an analytical gap between the data and the opinion proffered.

With these precepts in mind, we turn to the opinions that has been expressed by Sundboom.

2. *Legal Analysis.* The threshold issue before us is "specific not general," for we must "decide whether [Sundboom] had sufficient specialized knowledge to assist the jurors 'in deciding the particular issues in the case.'" *Kumho Tire Co., Ltd. v. Carmichael,* supra at 156–57, 119 S.Ct. 1167, quoting 4 J. McLaughlin, *Weinstein's Federal Evidence* ¶ 702.05[1], p. 702–33 (2nd ed.1998). We find that Sundboom has neither the specialized knowledge, nor an adequate factual basis, upon which to render expert opinions, on the duties and responsibilities of crane operators, that would assist the Jury in this matter.

The Record is uncontroverted that Sundboom's education consisted of a high school diploma, which he obtained in 1954, and about two months of vocational training, which was limited to "psychology applied to selling," and which he obtained in 1955. See, *Deposition of Gerald L. Sundboom,* at 4–5, *Exhibit 8 to Affidavit of Steven W. Schneider* ("Sundboom Deposition"). He also attended the George Meany Labor Center on three different occasions, between 1974 and 1978, and enrolled in a course in labor law negotiations at the University of Wisconsin, in approximately 1977. *Id.* at 5–6.

Sundboom began working for the hoisting and portable division of the Operating Engineers Union in 1954. *Id.* at 7. Thereafter, he received on-the-job apprenticeship training for about two years. *Id.* at 7–8. It was during this period of time that he learned crane operation. After completing the two-year apprenticeship, Sundboom worked for another eleven years operating cranes for general contractors. *Id.* at 14. Thus, the relevant time frame, in which Sundboom was operating cranes, was from 1954 to 1967—over three decades before Teska's accident. *Id.* at 14. Notwithstanding this dated experience, Sundboom is not, and has never been certified as a crane operator, *Id.* at 17, and, other than for his apprenticeship, Sundboom has never attended any formal training sessions regarding the operation of cranes, although he did attend in-house safety meetings which were held as part of union meetings, as well as on-the-job "toolbox" meetings, in which safety issues were discussed. *Id.* at 8.

Sundboom has testified that, to his knowledge, there are no classes offered, by his local Union, which teach crane operators the techniques of rigging, *id.* at 43–44, and he attributes the lack of such training to the fact that rigging is not the job of the crane operator. *Id.* at 44. Rather, Sundboom testified that crane operators must simply have an understanding of rigging procedures. *Id.* At no point, in his career, has Sundboom ever served as a member of any organization which promulgates standards for the operation of cranes, he has never written any articles concerning the matter of safe crane operation, and he has never provided any formal training on the operation of a crane. *Id.* at 18–19.

Since 1967, Sundboom has had no appreciable, relevant experience in working with cranes, or with crane operators. From 1967 to 1974, Sundboom was employed directly by his Union, first as a dispatcher,

and then as a business agent.[4] Later, from 1974 to 1978, he worked as a representative of the International Union of Operating Engineers, and his duties consisted principally of helping local unions negotiate labor contracts. *Id.* at 15. In 1978, Sundboom became the regional director for the International Union of Operating Engineers, and he worked, in that position, until his retirement in 1996. *Id.* at 16.

In preparing his opinion in this case, Sundboom reviewed the incident reports of Teska's accident, which were prepared by representative of both Jamar and Potlatch, the deposition of Fuglie, and photographs taken by the representatives of Boldt. *Id.* at 20–21.[5] He did not review any other documents, manuals, handbooks, or regulations, *id.* at 24; he did not view the site of the accident, *id.* at 21; he did not review the operative contracts, and subcontracts, *id.* at 22; and he did not interview any of the witnesses himself. *Id.* at 24. Sundboom conceded that he had not consulted any substantive texts, in forming his opinions in this case, and that he has relied solely upon his own past training and experience. *Id.* at 52. More importantly, the Record is bereft of any showing that Sundboom was personally aware of the construction practices of building contractors, particularly as they relate to the operation of a crane in Minnesota generally, or in northern Minnesota in particular, nor is there competent evidence to demonstrate that the opinions, which Sundboom is expected to express, have any contemporaneity.

Given the Record presented, it is inescapable that Sundboom's proposed testimony is the genre of opinion evidence that *Daubert,* and its progeny, were designed to spare the Courtroom. Were Sundboom to merely testify that crane operators have a legal duty not to lift a load which they recognized as posing a threat to persons below, then no expert testimony would be necessary—for such testimony would amount to no more than an expression of a generalized legal duty, as to which the Court could charge the Jury. Instead, Sundboom attempts to focus his testimony on affirmative acts which, in his view, Fuglie should have undertaken, as a crane operator, and thereby subject Fuglie's acts, or purported omissions, to a specific standard of care that the law does not generally recognize.

Under Minnesota law, which governs this aspect of our analysis,[6] "if it would be speculative for the factfinder to decide the issue of negligence without having the benefit of expert testimony on the standard of care, the expert testimony is necessary." *Atwater Creamery Co. v. Western Nat'l Mut. Ins. Co.,* 366 N.W.2d 271, 279 (Minn.1985); see also, *Mozes v. Medtronic, Inc.,* 14 F.Supp.2d 1124, 1128 (D.Minn.1998); *Seaton v. County of Scott,* 404 N.W.2d 396, 400 (Minn.App.1987), rev. denied (Minn., June 25, 1987). If, however, "the acts or omissions complained of

4. As a business agent, Sundboom's duties including dealing with problems which would arise in particular jobs, such as jurisdictional disputes, between the various construction trades. *Id.* at 15.

5. Sundboom also read the deposition testimony of Teska, Kangas, Sauter, John Raiha, and Larson. *Id.* at 23–24.

6. "As a federal court sitting in diversity jurisdiction, we apply the law the forum state would apply." *Winthrop Resources Corp. v. The Stanley Works,* 259 F.3d 901, 903 (8th Cir.2001), citing *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). "[Minnesota] law governs the standard of care in this diversity action." *Duston v. Daymark Foods, Inc.,* 122 F.3d 1146, 1147 (8th Cir.1997), citing *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

are within the general knowledge and experience of lay persons, expert testimony is not necessary to establish a standard of care, even in cases of alleged medical malpractice." *Atwater Creamery Co. v. Western Nat'l. Mut. Ins. Co.*, supra, citing *Hestbeck v. Hennepin Co.,* 297 Minn. 419, 212 N.W.2d 361 (1973).

With respect to Sundboom's opinions, which concern his belief as to the superiority of a shackle, over a sling choker, for the rigging of the column at issue here, we find no technicalities, in the physical concepts at play, which require expert testimony to establish Teska's case. Cf., *Kolosky v. Underground Contractors of Perham, Inc.*, 1997 WL 30839 * 2 (Minn.App. 1997) (disclaiming the need for expertise, since the "jury was familiar with road construction crews digging trenches and using backhoes and jackhammers."). As we have gleaned from the full Record presented, the choker employs the physics of a noose or snare—by tightly constricting around the width of the column, the column may be lifted into place and, when positioned, the noose can be loosened, and reused on the next column. A shackle, on the other hand, requires a metal connector to be inserted through a hole in the top of the column, secured by a threaded nut, and lifted by the crane to the proper location, where a boilermaker would have to unsecure the connector, by manually unthreading the nut.

Although the choker facilitates the removal of the rigging, over the shackle, the shackle provides a more secure connection to the column, while sacrificing ease of removal. Where, as here, the column does not have a plate, or other barrier, which could impede the choker from sliding over the top of the column, during the course of the lift, the shackle would theoretically, as a pure matter of physical science, provide a greater margin of safety than would be afforded by the choker. Of course, in all such matters of physical science, the degree of safety is on a continuum—welding a connector to the column, for example, could theoretically provide a greater margin of safety than either a shackle or a choker. On the Record, it remains a Jury issue as to what margin of safety, if any, is realistically provided by a shackle over a choker, or whether the column fell because the choker was not properly fastened to the column, by Kangas and Sauter, so as to accomplish its intended purpose. On this Record, Sundboom is unable to afford any assistance to the Jury, on the superiority of one form of rigging over the other, as he did not personally witness the rigging procedure, and he brings no knowledge or experience to the Jury that lay persons would not already fully comprehend.

As to Sundboom's opinion, that Fuglie had an affirmative duty to inspect the rigging of Kangas and Sauter, we find that Sundboom's past experience and training—as dated as it is—provides no suitable basis upon which a Jury could properly rely in determining whether such a professed standard of care should apply to all crane operators and, if so, whether it had been breached by Fuglie. We make plain, however, that we do not question Sundboom's assertion, that he holds the view that he professes, but his personally held opinion has no place in the Courtroom where, as here, it has neither a solid foundational basis in his experience, training or education, nor an objective source of verification.[7] In the vernacular, Sundboom's

7. We are mindful that the Plaintiffs have submitted two writings which they proffer as supportive of Sundboom's expression of a specialized standard of care for crane operators. See, *Exhibits 2 and 5* to the Plaintiffs' Responsive Memorandum. In pertinent part, each exhibit states as follows:

> [The Crane Operator should] [u]nderstand load rigging procedures and advise the responsible person if a doubt exists as to the

opinion, on this subject, is undergirded by no more than *ipse dixit*—it must be so, merely because Sundboom has said it is so.

Although our role is not to determine whether Sundboom's opinion is a correct one, see *Bonner v. ISP Technologies, Inc.*, supra at 929, the serendipitous nature of his proposed standard of care is reflected in the following exchange:

Q. In the case where this lift is made using a shackle, is it the crane operator's responsibility to determine that the shackle pin has been completely tightened before the lift is made?

A. No.

Q. Is it the crane operator's responsibility to determine that the shackle being used is properly rated for the lift?

A. No.

Q. Is it the crane operator's responsibility to determine that the sling being used is properly rated for the lift?

A. No.

Q. Is it the crane operator's responsibility to inspect the sling being used for damage which might affect its ability to handle the load?

A. No.

Q. All of those responsibilities that I've just gone through are the responsibilities of members of the rigging crew?

A. Correct.

*Sundboom Deposition,* at 51–52.

Given Sundboom's disclaimer, as to any affirmative duty on the part of crane operators, to closely inspect the actions, or omissions, of the rigging crew in the foregoing particulars, we are unable to discern any distinction as to why Fuglie had an affirmative duty to reject the form of rigging, that the boilermakers here had chosen to employ, apart from the fact that the choice of rigging is alleged to have caused injury to the party who retained Sundboom to testify. Such a distinction provides an infirm foundation for expert testimony.

All concede—understandably, we think—that the column was not properly rigged, and that the failure in rigging ultimately led to Teska's injury. The column did not fall because the slings were worn, and broke, or because the crane's boom was caused to strike some foreign object. Rather, the accident occurred because the column was not safely secured for the entirety of its passage, from the point of lift, to the point at which the column would be secured into place. Indeed, the accident reports of both Jamar, and Potlatch, as well as the testimony of Larson and Teska, have identified improper rigging as the sole cause of the accident. Left to be determined, however, is whether that

adequacy of the rigging (possible only when the load is visible to the operator). The operator shall reject any sling, choker, or rigging device which is inadequate, improper, or unsafe.

The sentiments expressed, however, do not bear the authority of any recognized rulemaking organization, which governs the conduct of crane operators, and was not recognized, as authoritative, by Sundboom or any other expert, in this litigation. While, under Rule 803(18), Federal Rules of Evidence, the content of those writings was "called to the attention" of Boldt's expert witness and, in part, to Sundboom, neither established the writings as a "reliable authority," nor do we find the substance of the writings to be sufficiently cogent to warrant our taking them as authoritative by judicial notice. See, Rule 201(b), Federal Rules of Evidence; see also, *LensCrafters, Inc. v. Vision World, Inc.,* 943 F.Supp. 1481, 1495–96 (D.Minn.1996), citing *Rule 56(e), Federal Rules of Civil Procedure* ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.").

cause was attributable to some failure to properly deploy a choker, or due to some incapacity in a choker, as a rigging device, to perform the task assigned—an incapacity which Fuglie, as a crane operator, should have recognized. As to that determination, however, Sundboom is unable to express an admissible opinion, as he has proffered no basis to comment on any crane operator's training, other than his own, and that had been completed some thirty-plus years before Teska's accident occurred.

Accordingly, finding fatal deficiencies in Sundboom's qualifications to testify concerning the specialized standard of care he would apply to crane operators, and finding that his other proffered opinions are within the province of lay persons, and would not be assisted by Sundboom's purported expertise, we grant Boldt's Motion *in limine* to exclude Sundboom's opinions at the time of Trial.[8]

B. *The Defendant's Motion for Summary Judgment.*

In addition to Boldt's Motion to exclude the testimony of Sundboom, it has also moved for Summary Judgment on two different grounds. First, Boldt contends that, without Sundboom's testimony, the Plaintiffs have failed to advance a *prima facie* case of negligence that would be cognizable against it at the time of Trial. Second, Boldt argues that, under the Loaned Servant Doctrine, Fuglie should be treated as an employee of Jamar, who also employs Teska and that, resultantly, Teska's suit is barred by the Minnesota Worker's Compensation Act. After reviewing the appropriate Summary Judgment standard, we will address each of these contentions in turn.

1. *Standard of Review.* Summary Judgment is not an acceptable means of resolving triable issues, nor is it a disfavored procedural shortcut when there are no issues which require the unique proficiencies of a Jury in weighing the evidence, and in rendering credibility determinations. See, *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary Judgment is appropriate when we have viewed the facts, and the inferences drawn from those facts, in a light most favorable to the nonmoving party, and we have found no triable issue. See, *Krentz v. Robertson,* 228 F.3d 897, 901 (8th Cir.2000); *Curry v. Crist,* 226 F.3d 974, 977 (8th Cir.2000); *Carter v. St. Louis Univ.,* 167 F.3d 398, 400 (8th Cir. 1999). For these purposes, a disputed fact is "material" if it must inevitably be resolved and the resolution will determine the outcome of the case, while a dispute is "genuine" if the evidence is such that a reasonable Jury could return a Verdict for the nonmoving party. See, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Herring v. Canada Life Assurance,* 207 F.3d 1026 (8th Cir.2000); *Liebe v. Norton,* 157 F.3d 574, 578 (8th Cir.1998); *Dodd v. Runyon,* 114 F.3d 726, 729 (8th Cir.1997).

As Rule 56(e) makes clear, once the moving party files a properly supported Motion, the burden shifts to the nonmoving party to demonstrate the existence of a genuine dispute. In sustaining that burden, "an adverse party may not rest upon the mere allegations or denials of the ad-

8. The Plaintiffs have also retained Ron Youngdahl ("Youngdahl"), as a backup expert to testify if Sundboom is unavailable at the time of Trial. We earlier excluded Youngdahl as an expert, since the disclose of his opinions was untimely, although we allowed for the possibility that Youngdahl might be permitted to testify if Sundboom was not available. Given the absence of full briefing on the specific issue of Youngdahl's expertise, we express no view as to whether Youngdahl's opinion testimony would elude the fatal failings of Sundboom's proposed testimony.

verse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial." *Rule 56(e), Federal Rules of Civil Procedure;* see also, *Anderson v. Liberty Lobby, Inc.*, supra at 256, 106 S.Ct. 2505; *Allen v. Entergy Corp.*, 181 F.3d 902, 904 (8th Cir.1999); *Jaurequi v. Carter Mfg. Co.*, supra at 1085. Moreover, the movant is entitled to Summary Judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* supra at 322, 106 S.Ct. 2548; see also, *Hammond v. Northland Counseling Center,* Inc., 218 F.3d 886, 891 (8th Cir. 2000); *Greer v. Shoop,* 141 F.3d 824, 826 (8th Cir.1998). No genuine issue of fact exists in such a case because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* supra at 323, 106 S.Ct. 2548; see also, *Bell Lumber and Pole Co. v. United States Fire Ins. Co.*, 60 F.3d 437, 441 (8th Cir.1995); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 510 (8th Cir.1995); *Settle v. Ross,* 992 F.2d 162, 163 (8th Cir.1993).

2. *Legal Analysis.*

a. *The Prima Facie Case of Negligence.*

Boldt asserts that, without Sundboom's testimony, the Plaintiffs will be unable to prove that Boldt, vicariously though Fuglie, owed Teska a duty of care, or that Fuglie breached that duty. We disagree.

To make out a case of negligence, a plaintiff must show that the defendant owed the plaintiff a certain duty of care; that the defendant breached that duty; and that the breach proximately caused the plaintiff injury. See, e.g., *Gilbertson v. Leininger,* 599 N.W.2d 127, 130 (Minn. 1999); *Johnson v. State,* 553 N.W.2d 40, 48 (Minn.1996); *Hudson v. Snyder Body, Inc.*, 326 N.W.2d 149 (Minn.1982); *Gradjelick v. Hance,* 627 N.W.2d 708, 711 (Minn.App.2001). To prove that Fuglie, and therefore Boldt, owed Teska a duty of care, and that the duty was breached, the Plaintiffs have relied, in no small part, on the proposed expert testimony of Sundboom. While we have determined that Sundboom's testimony is inadmissible, that determination does not end our inquiry, however.

Apart from any specialized standard of care, Boldt, through Fuglie, owed Teska the standard of care that a reasonable man would have exercised under the same or similar circumstances—that is, the ordinary standard of care that is applicable in negligence actions under Minnesota law. See, *Blatz v. Allina Health System,* 622 N.W.2d 376, 383 (Minn.App.2001) ("An ordinary person has a duty to do what a reasonable person would do under the same or similar circumstances.") [quoting W. Page Keeton, *Prosser and Keeton on the Law of Torts* § 37, at 236 (5th ed.1984)], rev. denied (Minn., May 16, 2001); see also, *Seim v. Garavalia,* 306 N.W.2d 806, 810 (Minn.1981) ("The standard for ordinary negligence is 'the traditional standard of the reasonable man of ordinary prudence.' "), quoting Prosser, "Contributory Negligence as a Defense to Violation of Statute," 32 *Minn.L.Rev.* 105, 110 (1948). Under Minnesota law, "[n]egligence consists of 'a departure from a standard of conduct required by the law for the protection of others against unreasonable risk of harm.' " *Seim v. Garavalia,* supra at 810, quoting Prosser, supra at 110.

Whether Fuglie and, resultantly Boldt, breached this duty of care is, quintessentially, a Jury issue, as the material facts are genuinely in dispute. Teska con-

tends that, notwithstanding Fuglie's experience as a crane operator, Fuglie should have recognized the palpable danger in rigging the column with a choker as it had been done by Kangas and Sauter. Fuglie denies any such appreciation of danger, and maintains that the employment of such chokers is commonplace in the construction industry. Fuglie's denial, at least implicitly, is supported by the actions of Kangas, and Sauter, who elected to employ a choker, after having considered the feasibility of a shackle. According to Teska, however, as experienced boilermakers, Kangas, and Sauter, should have known better.[9]

Given this conflict in the evidence, we conclude that the issue of whether Boldt, through Fuglie, committed a negligence act which proximately caused injury to Teska is properly a matter for the Jury's determination, and we deny Boldt's Motion for Summary Judgment on that ground.

b. *The Loaned Servant Doctrine.*

Boldt also seeks Summary Judgment on the basis of the Loaned Servant Doctrine, as Boldt contends that, at the time of the accident, Fuglie—although normally employed by Boldt—was acting as a loaned servant of Jamar, which also employed Teska. As a consequence, Boldt maintains that the Minnesota Worker's Compensation Act bars the recovery that the Plaintiffs seek here. See, *Minnesota Statutes Section 176.001 et seq.*

In an employer-employee relationship, an employer can be held vicariously liable for the negligent acts of its employee, as long as those acts are within the "course and scope of [the employee's] employment." *Ismil v. L.H. Sowles Co.*, 295 Minn. 120, 203 N.W.2d 354, 357 (1972). By commencing his action against Boldt, Teska seeks to recover damages, over and above his Workers Compensation benefits, by asserting that Fuglie was negligent in his operation of Boldt's crane, thereby vicariously imposing liability upon Boldt. In a case such as this, however, where one employer—Jamar—is using another employer's employee, the Loaned Servant Doctrine works to shift liability for that employee's negligent acts from the regular or general employer—here, Boldt—to the borrowing or special employer—here, Jamar. *Id.* If the Loaned Servant Doctrine should apply, then Boldt cannot be held vicariously liable for Fuglie's alleged negligence because, at the time of the injury, Fuglie was effectively an employee of Jamar.

9. During the course of his deposition, Fuglie testified as follows:

Q. *** Have you ever made a lift of this type of column by means of the single choke where the end of the col—where the end of the column is of no greater circumference than the body of the column itself?
A. Yeah.

* * * * * * *

Q. In all the training you've had, including this certification process that you went through, were you ever told that it's an acceptable—acceptable way to rig this type of column (indicating) with a single choke that was used on this lift?
A. I don't think I was ever trained one way or the other as to what would be acceptable, because we depend on the craft that we're working with to know how to rig.
Q. Is it true that you can refuse to make a lift that you do not believe is safe to make?
A. Yes. That's true.
Q. In fact, that's the crane operator's responsibility, is it not?
A. I guess it can be. Yeah.

* * * * * * *

A. It's—it's my prerogative to not make a lift—yes—if I think that it's not safe. Yes.

*Fuglie Deposition*, at 20–21.

Although he did not employ the phraseology of as the reasonable person standard, Fuglie's recognition, that he owed a duty to those surrounding him, not to lift an unsafe load, incorporates an equivalent duty of care.

Two tests are employed in determining whether a worker is a loaned servant. The first is the "whose business" test, which asks, "[a]t the time of the negligent act, which employer's business was being done or furthered." See, *Nepstad v. Lambert,* 235 Minn. 1, 50 N.W.2d 614, 620 (1951); see also, *Ismil v. L.H. Sowles Co.,* supra at 357. The second test is the "right of control or direction test," which was explained, in *Nepstad,* as follows:

> The so-called "right of control or direction" test assumes to place the responsibility for the servant's negligence upon the employer having the right to control his actions at the time the negligent act occurs.

*Id.*

As the *Nepstad* Court observed, determining the applicability of the Loaned Servant Doctrine is normally a question for the factfinder, although "it is well established that," if there are no factual disputes, "and no jury would be entitled to find that there was not a loaned loaned-servant relationship, the question becomes one of law." *Id.* at 619.

In *Nepstad,* the plaintiff was employed by the L.G. Arnold Co. ("Arnold"), which was a general contractor working on a project in Menomonie, Wisconsin. *Id.* at 617. In order to perform certain work on the project, Arnold rented a crane, and two crane operators, from one of the Defendants, J.M. Lambert ("Lambert"). *Id.* The crane was first employed to install prefabricated trusses and, since the crane operator, who was employed by Lambert, could not hear oral instructions over the noise of the crane, his movements were directed entirely by hand signals, which were given by Arnold's employees. *Id.*

In addition, the crane was used to move four steel truss sections from the north side to the south side of the plant. *Id.* Although there was a discussion as to the route, and procedures, that would be used to move the trusses, the crane operator was not a part of that discussion, and only knew what he was supposed to do when he was provided with appropriate signals. *Id.* at 619. While backing along the road, the crane operator, who was not able to see what was behind him, again took signals from the general contractor's foreman, or from the plaintiff. *Id.* At some point, during the movement of the trusses, a portion of the crane came into contact with a power line, and caused injuries to the plaintiff. *Id.*

In *Nepstad,* the Court determined that the "whose business" test did not aid the analysis there, and the Court went on to explain, as follows:

> This test is practically valueless where, as in the instant case, the general employer's business consists of furnishing men to perform work for the special employer, because by doing his job the worker is necessarily furthering and doing the business of both employers. If the test is meant to determine whether or not the worker's status was that of a servant of an independent contractor at the time of the negligent act, then it only begs the question and must depend for its answer on the 'control' test.

*Id.* at 620.

Although the same observation is not entirely true in this case, as Boldt's entire business did not consist of renting cranes and operators to other contractors, we still believe, as do the parties, as reflected in their briefing, that the pivotal test is the "right of control" inquiry.

Nonetheless, even if we were to apply the "whose business test," so as to determine "which employer's business was being done or furthered" at the time of the negligent act, see, *id.*, it is clear that it was Jamar's business that was being furthered at the time Teska was injured, since it was

Jamar's responsibility to install the columns that prompted the injuries sustained. See, *Larson Deposition,* at 14. More importantly, it was Jamar's responsibility to rig the columns to be lifted by the crane. See, *Larson Deposition,* at 14; see also, *Ismil v. L.H. Sowles Co.,* supra at 124, 203 N.W.2d 354 ("The question is not whether the worker remains the employee of the general employer as to general matters, but whether, as to the act in question, he is acting in the business of and under the direction of the borrowing employer.").

Under the "right of control" test, the "crucial question is which employer had the right to control the particular act giving rise to the injury." *Nepstad v. Lambert,* supra at 621–22; see also, *Minnkota Power Coop., Inc. v. Manitowoc Co.,* 669 F.2d 525, 531 (8th Cir.1982); *Ismil v. L.H. Sowles Co.,* supra at 124, 203 N.W.2d 354 ("[T]he directions of the borrowing employer must be commands and not requests if the employee is to be converted into a loaned servant, and *** the borrowing employer must have authority to exercise detailed authoritative control over the manner in which the employee is performing the work."). The lending, or general employer, does not have to completely surrender all control over the employee, and the borrowing, or special employer, does not have to exercise complete control over the employee, such as the ability to discipline or to fire. See, *Nepstad v. Lambert,* supra at 621. Both employers may have control over the employee, and there is nothing "logically inconsistent *** in finding that a given worker is the servant of one employer for certain acts and the servant of another for other acts." *Id.*

As the Court elaborated, in *Nepstad,* for the doctrine to apply, the orders of the borrowing employer must be commands, not requests. *Id.* at 622. "Authority to designate only the result to be reached is not sufficient under the control test." *Id.* Rather, "[t]here must be the authority to exercise detailed authoritative control over the manner in which the work is to be done." *Id.* Thus, actions such as hand signaling, which have the effect of commands in certain situations, have lead a number of Courts to conclude that the doctrine applies. See, e.g., *Ismil v. L.H. Sowles Co.,* supra at 123, 203 N.W.2d 354 (deciding that the facts of the case created a question of fact for the Jury on the Loaned Servant Doctrine); *Nepstad v. Lambert,* supra at 622 (determining that, on the facts of the case, the Loaned Servant Doctrine applied as a matter of law); *Salmonson v. M.A. Mortenson Co.,* 1993 WL 367572 (Minn.App.1993) (same). Moreover, the Courts have not interpreted the doctrine narrowly and, therefore, do not require that every movement of the borrowed employee be dictated by the borrowing employer. See, *Ismil v. L.H. Sowles Co.,* supra at 123, 203 N.W.2d 354. Rather, as long as the borrowing employer had the exclusive right to direct all movements, the doctrine applies. See, *Nepstad v. Lambert,* at 623 ("The absence of actual control at the time of the negligent act does not alter its liability.").

It is beyond dispute that, at the time that the column was lifted, Fuglie's actions, in operating the crane, were under the control and direction of Jamar—the borrowing employer. After the column was first rigged, Jamar's employees were not satisfied that the column would hang perpendicular to the ground, and they caused the column to be rigged differently, not at Fuglie's request or command, nor because of any slippage in the double choke that had initially been applied. The decision to rig the column differently only followed a discussion, between Kangas and Sauter, in which the comparative uses of a choke, or a shackle, were explored. There is no suggestion, let alone evidence, that

Fuglie was asked to participate in that discussion, that he made any recommendations as to the type of rigging to employ, or that he was directed by anyone, from either Boldt or Jamar, to evaluate the rigging that the boilermakers had elected to apply.

Absent from this Record is any indication, however slight, that during the time that Fuglie physically observed the lift, there was any indication that the column was not secured by the choke that the boilermakers had applied. Nor is there any showing, in this Record, that Fuglie was controlling the ultimate placement of the column, when it slipped from its rigging. The movement of the column was at the direction of Jamar's employees, who had positioned themselves at the point of the column's ultimate descent in order to weld the column into its designated place. To do so, Fuglie took direction from the Jamar employees, as those directions were communicated from Teska, to Sauter, to Kangas, to Fuglie. Since, during the "blind" portion of the transfer, Fuglie could not observe the placement of the column, his movement of the crane, and of the column dangling from the crane, was solely at the direction of Jamar's employees. There is not the slightest showing that Boldt, or anyone other than a Jamar employee, was involved in directing Fuglie's actions. Given the Record presented, we are unable to meaningfully distinguish the Minnesota Supreme Court's holding, in *Nepstad,* from the circumstances which resulted in Teska's injuries, and we conclude, as a matter of law, that the Loaned Servant Doctrine applies, so as to effectively convert Fuglie into a Jamar employee at the time of the accident.

In contrast, the Plaintiffs urge us to find that the negligent act was not the lift of the column itself, but was Fuglie's decision to make the lift. As a result, they contend that Summary Judgment is inappropriate because a Jury could find that, at the time of the negligent act—assertedly, the decision to make the lift—Fuglie was not under the control of Jamar. In particular, the Plaintiffs point to testimony of Fuglie, and of Boldt's expert, Ronald M. Kohner, that a crane operator has the authority to refuse to make a lift that he deems unsafe. See, *Fuglie Deposition,* at 21; *Deposition of Ronald M. Kohner,* at 47–8, *Exhibit 2 to Plaintiffs' Responsive Memorandum Opposing Defendant's Motion in Limine and Motions for Summary Judgment.*

While we can accept, as Fuglie admits, that he can refuse to do what he regards as an unsafe act, were we to agree with the Plaintiffs, then the Loaned Servant Doctrine would never have application, for every employee, loaned or otherwise, ultimately has the discretion to refuse to do an act which he or she regards as unsafe. The issue is not whether Fuglie could refuse the lift but, rather, whose employee was he when that decision was presented. Here, notwithstanding the Plaintiffs protestations to the contrary, Fuglie was integrally a part of a team effort to move a column from one point to another. A portion of that team rigged the column, and then re-rigged the column, according to their past experience and training. Fuglie's responsibility was to operate the crane so as to transfer the column according to the directions provided by Jamar's employees. Contrary to the Plaintiffs' argument, we have found no authority, and the Plaintiffs cite none, which elevates a crane operator into the position of an insurer for the safe rigging of a load to be lifted, when the load is rigged by the employees of the borrowing employer, and the transfer of the load is directed by those same employees, in order to satisfy the contractual obligations of that borrowing employer. Thus, we find that, as a matter of law, Jamar had the exclusive right to control Fuglie at the time of the

accident which resulted in injury to Teska and, consequently, we conclude that the Loaned Servant Doctrine applies so as to deny a recovery from Boldt over and above the Workers Compensation benefits which Teska has received to date. Therefore, we grant the Defendant's Motion for Summary Judgment on this ground.

Lastly, even though the line of authority was not identified, nor argued, by the parties, we further conclude that the same result is required by what appears to be a slight variant of the Loaned Servant Doctrine. In *Ritter v. M.A. Mortenson Co.,* 352 N.W.2d 110 (Minn.App. 1984), a steel worker, who was employed by a subcontractor of M.A. Mortenson ("Mortenson"), elected to receive Workers Compensation benefits for an injury he sustained, when he was struck by the boom of a crane which had been supplied by Mortenson, and which was then being operated by a Mortenson employee. Mortenson moved for Summary Judgment, arguing that the crane operator was a loaned servant, but Summary Judgment was ultimately granted on the basis of Minnesota Statutes Section 176.061, Subdivisions 1 and 4, which provide as follows:

> Subdivision 1. Election of remedies. If an injury or death for which benefits are payable occurs under circumstances which create a legal liability for damages on the part of a party other than the employer and at the time of the injury or death that party was insured or self-insured in accordance with this chapter, the employee, in case of injury, or the employee's dependents, in case of death, may proceed either at law against that party to recover damages or against the employer for benefits, but not against both.
>
> * * * * * *
>
> Subdivision 4. Application of subdivisions 1, 2, and 3. [The above provision applies] only if the employer liable for benefits and the other party legally liable for damages are insured or self-insured and engaged, in the due course of business in, (a) furtherance of a common enterprise, or (b) in the accomplishment of the same or related purposes in operations on the premises where the injury was received at the time of the injury.

In applying these statutory provisions, the Court stated the requisites of proof, as enunciated in *McCourtie v. United States Steel Corp.,* 253 Minn. 501, 506, 93 N.W.2d 552, 556 (Minn.1958), as follows:

> (1) The employers must be engaged on the same project;
>
> (2) The employees must be working together (common activity); and
>
> (3) In such fashion that they are subject to the same or similar hazards.

*Ritter v. M.A. Mortenson, Co.,* supra at 112.

The Court proceeded to note that the focus of the inquiry should be upon the activities of the employees, rather than the employers, and drew the following guidance from *McCourtie:*

> Before such common activity can be said to exist there must be work in which both sets of employees participate ***. Where however two employers perform different types of work, such as steel construction work and plumbing, and where the performance of these jobs is not related except in a vague, general way looking toward the completion of a structure, and where the activities of the two sets of employees have nothing in common and do not share or join in any of the work between themselves, it cannot be said that the employees are within the "common activities of the employees test" ***.

*Id.*, citing *McCourtie v. United States Steel Corp.*, supra at 510, 93 N.W.2d at 559.

Having set forth the governing principles of law, the Court concluded, as follows, that the "common enterprise" provision precluded the steel worker from maintaining a negligence action against the employer of the crane operator:

> The facts in the record are undisputed that both Mortenson and the appellant's employer, H.D., were engaged in the same project—the construction of an MTC garage. It is also agreed by both parties that the appellant and the crane operator were both engaged in erecting the steel superstructure for the building. The steel erection crew consisted of the foreman, two "hookers", whose function was to hook steel beams on to the crane, the crane operator, who hoisted the steel beams, and two "connectors," who connected the beams to the existing structure. The "connectors," appellant and another man, also were responsible for signaling commands to the crane operator. The appellant and the crane operator were thus clearly working together in furtherance of the same objective. Indeed, the appellant in his own deposition stated that they were all part of one crew, which was normal for that type of operation. As the trial court noted further, each of those crew members were subject to the same or similar hazards of the job, such as falling beams, electrical shock, injury from the crane, etc.

*Ritter v. M.A. Mortenson Co.*, supra at 113.

Ultimately, the Court concluded, as a matter of law, that since the steel worker had elected to receive Workers Compensation benefits for his injuries, he was precluded, by the provisions of Minnesota Statutes Section 176.061, from "also bringing this common law action against Mortenson."

We seriously doubt that any authority, under the laws of Minnesota, could be found which more closely assimilates the facts presented by the Plaintiffs' claims here, than that presented in *Ritter*. Apart from a different mode of injury—namely, being struck by the boom of the crane, as opposed to Teska's fall, owing to the accidental slip of the column from its rigging—the Court's decision, in *Ritter*, is factually apposite. There can be no serious question that Fuglie, and Teska, were working on the same project, and were working together in a common activity and, as recognized by the *Ritter* Court, they were exposed to the same or similar hazards of the job, including "falling beams, electrical shock, injury from the crane, etc." *Id.* Indeed, the hazard to Fuglie of an injury from a falling column, which had not been properly secured, was more proximate, and predictable, than the likelihood that a crane operator would be struck by the crane's boom, which was the circumstance in *Ritter*.

Although the Court's analysis, in *Ritter*, was not subject to direct review by the Minnesota Supreme Court, subsequently, the Court has had occasion to interpret the import of Minnesota Statutes Section 176.061, under circumstances less compelling than either here, or in *Ritter*, and it has applied the prohibitions of that statute so as to preclude an action against a general contractor who was engaged in a common enterprise with a subcontractor who employed a worker, who had been injured in the course of that common enterprise, by an employee of that general contractor, because the injured employee had elected to obtain Workers' Compensation benefits from his own employer. See, *O'Malley v. Ulland Bros.*, 549 N.W.2d 889, 897 (Minn. 1996). Here, the Record reflects that Teska has been paid and, at the time of his deposition, was continuing to be paid, Workers' Compensation benefits for his

injuries, presumably at the expense of Jamar, or Jamar's Workers Compensation insurer. See, *Teska Deposition,* at 145. Even if those benefits had been paid by Boldt, the result we reach would not be different. See, *Ritter v. M.A. Mortenson Co.,* supra at 111 (Preclusion of Section 176.061 applied even though general contractor had paid the Workers Compensation benefits to the injured employee of a subcontractor because the subcontractor had failed to obtain the proper coverage for its employees). Accordingly, we grant Summary Judgment to Boldt on the basis of Section 176.061, as well. See, *O'Malley v. Ulland Bros.,* supra at 897 ("A determination of whether a common enterprise existed is a legal determination, and not a factual inference.").

NOW, THEREFORE, It is—

ORDERED:

1. That the Defendant's Motion *in limine* [Docket No. 27] is GRANTED.

2. That the Defendant's Motion for Summary Judgment [Docket No. 27] is GRANTED.