Debra MEDALEN, Plaintiff,

v.

**TIGER DRYLAC U.S.A., INC., and Dupont Powder Coatings U.S.A., Inc., Defendants.**

No. CIV.01–331 RLE.

United States District Court, D. Minnesota.

March 31, 2003.

DeAnna M. McCashin, Schoep & McCashin, Alexandria, MN, for plaintiff.

Scott Patrick Drawe, Drawe & Heisick, Minneapolis, MN, for Tiger Drylac, Inc., defendant.

Jack Michael Fribley, Peter Jophn Goss, Faegre & Benson, Minneapolis, MN, for Dupont Powder Coatings U.S.A., Inc.

## ORDER

ERICKSON, United States Magistrate Judge.

At Duluth, in the District of Minnesota, this 31st day of March, 2003.

### I. · *Introduction*

This matter came before the undersigned United States Magistrate Judge pursuant to the consent of the parties, as authorized by the provisions of Title 28 U.S.C. § 636(c), upon the Defendants' Motions for Summary Judgment.[1]

At a Hearing on the Motions, the Plaintiff appeared by DeAnna M. McCashin, Esq., the Defendant Tiger Drylac U.S.A., Inc. ("Tiger Drylac"), appeared by Scott P. Drawe, Esq., and the Defendant Dupont Powder Coatings U.S.A., Inc. ("Dupont"), appeared by Peter J. Goss, Esq. For reasons which follow, we grant the Defendants' Motions for Summary Judgment.[2]

---

1. In addition, the Defendant Tiger Drylac U.S.A., Inc., had sought sanctions against the Plaintiff, pursuant to Rule 11, Federal Rules of Civil Procedure, and Minnesota Statutes Section 549.21, but, by letter dated October 7, 2002, that Motion was withdrawn. See, *Docket No. 41.* Accordingly, we direct the Clerk of Court to record, in the docket entries, that the Defendants' Motion for Sanctions has been mooted by its withdrawal.

2. Two weeks after the Hearing on the Motions, the Plaintiff filed an informal Motion to Expand the Summary Judgment Record, which was both uninvited, and noncompliant with the Local Rules of this Court. Local Rule 7.1 requires that moving parties file with any Motion a Memorandum of Law, and they are obligated to secure a Hearing date. The Defendants oppose this Motion as untimely. We grant the Motion, notwithstanding its noncompliance with the Motion practice in this District, since the materials appended to the Plaintiff's Motion are the exhibits to the deposition of Dr. Terry T. Martinez, whose deposition, without exhibits, was already a part of the Record before us. Accordingly, we have reviewed—unguided by either the Plaintiff, or much of the testimony of Dr.

## II. *Factual Background*

This is a products liability action. The Plaintiff was employed by Watkins Aircraft Support Products ("WASP"), first in 1985, for six months on a part-time basis, and then again, in 1987, on a full-time basis. The Plaintiff worked as a grinder and painter, which necessitated her use of powder paint products that were designed, and manufactured, by the Defendants. The Plaintiff asserts that exposure to the Defendants' products caused her to develop a basal cell carcinoma—a form of malignant skin cancer—on the bridge of her nose. The Plaintiff alleges that Tiger Drylac manufactured a powdered paint product, which is identified as 49/42330, and that Dupont manufactured a powdered paint product, which is identified as Silver Horn II, which she used in the course of her employment at WASP. As a consequence of her injuries, the Plaintiff asserts claims of common law negligence; strict liability; breach of express and implied warranty; misrepresentation; false statement in advertising, in violation of Minnesota Statutes Section 325F.67; a violation of the Minnesota Consumer Fraud Act, Minnesota Statutes Section 325F.69; and a violation of the reporting requirements of the Federal Consumer Products Safety Act, as promulgated in 16 C.F.R. pt. 1115.

The Defendants contest the Plaintiff's assertion, that their products are carcinogenic, or that they caused the Plaintiff's ailment. In addition, the Defendants specifically argue that the Plaintiffs' strict liability, and breach of warranty claims, are barred by the applicable statute of limitations; that the Plaintiff's breach of implied warranty claim is preempted by the Plaintiff's strict liability claim; that the Plaintiff's Consumer Fraud Act, false advertising, and Consumer Products Safety Act claims, fail to state a claim; and that the Plaintiff's misrepresentation claim is unsupported by evidence in the Record.

## III. *Discussion*

A. *Standard of Review.* Summary Judgment is not an acceptable means of resolving triable issues, nor is it a disfavored procedural shortcut when there are no issues which require the unique proficiencies of a Jury in weighing the evidence, and in rendering credibility determinations. See, *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary Judgment is appropriate when we have viewed the facts, and the inferences drawn from those facts, in a light most favorable to the nonmoving party, and we have found no triable issue. See, *Luigino's, Inc. v. Peterson,* 317 F.3d 909, 911 (8th Cir.2003); *Duffy v. McPhillips,* 276 F.3d 988, 991(8th Cir.2002); *Schoolhouse Inc. v. Anderson,* 275 F.3d 726, 728 (8th Cir.2002); *Krentz v. Robertson Fire Protection Dist.,* 228 F.3d 897, 901 (8th Cir.2000).

For these purposes, a disputed fact is "material," if it must inevitably be resolved and the resolution will determine the outcome of the case, while a dispute is "genuine," if the evidence is such that a reasonable Jury could return a Verdict for the nonmoving party. See, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Herring v. Canada Life Assurance,* 207 F.3d 1026, 1028 (8th Cir.2000); *Austin v. Minnesota Mining and Manuf. Co.,* 193 F.3d 992, 995 (8th Cir.1999); *Liebe v. Norton,* 157 F.3d 574, 578 (8th Cir.1998); *Peter v. Wedl,* 155 F.3d 992, 996 (8th Cir.1998).

As Rule 56(e) makes clear, once the moving party files a properly supported Motion, the burden shifts to the nonmoving party to demonstrate the existence of a genuine dispute. In sustaining that bur-

Martinez—the exhibits to the Martinez deposition. See, *Docket No. 46.*

den, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial." *Rule 56(e), Federal Rules of Civil Procedure;* see also, *Anderson v. Liberty Lobby, Inc.,* supra at 256, 106 S.Ct. 2505; *Allen v. Entergy Corp.,* 181 F.3d 902, 904 (8th Cir.1999); *Jaurequi v. Carter Manufacturing Co.,* 173 F.3d 1076, 1085 (8th Cir.1999). Moreover, the movant is entitled to Summary Judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* supra at 322, 106 S.Ct. 2548; see also, *Hammond v. Northland Counseling Center, Inc.,* 218 F.3d 886, 891 (8th Cir.2000); *Greer v. Shoop,* 141 F.3d 824, 826 (8th Cir.1998). No genuine issue of fact exists in such a case because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* supra at 323, 106 S.Ct. 2548; see also, *Bell Lumber and Pole Co. v. United States Fire Ins. Co.,* 60 F.3d 437, 441 (8th Cir.1995); *McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 510 (8th Cir.1995); *Settle v. Ross,* 992 F.2d 162, 163 (8th Cir.1993).

B. *Legal Analysis.* Before addressing the core of the Defendants' Summary Judgment argument—that the Plaintiff lacks evidence to sustain her assertion that the Defendants' products were carcinogenic, and that their products caused her injury—we consider the Defendants' other objections, starting with their assertion that the Plaintiff's strict liability, and breach of warranty claims, are time-barred.

1. *The Defendants' Statute of Limitations Defense.* Both the Plaintiff's cause of action for strict liability, and for a breach of warranty, are governed by a four-year statute of limitations, that commences when the injury accrued. See, *Minnesota Statutes Section 541.05, Subdivision 2;* and *Minnesota Statutes Section 336.2–725(1);* see also, *City of Willmar v. Short–Elliott–Hendrickson, Inc.,* 475 N.W.2d 73, 80 (Minn.1991)(breach of express and implied warranties); *Erickson v. Coast Catamaran Corp.,* 414 N.W.2d 180, 181 (Minn.1987)(strict liability); *Metropolitan Life Ins. Co. v. M.A. Mortenson Companies, Inc.,* 545 N.W.2d 394, 400 (Minn. App.1996)(breach of express warranty). The Defendants maintain that, because the Plaintiff first developed a sore on the bridge of her nose in 1996, and did not file this action until February 22, 2001, her claims are, necessarily, time-barred.

In her Motion papers, the Plaintiff claims, repeatedly, that the Complaint was filed on February 22, 1997, which, of course, would resolve the statute of limitations defense, as the Complaint would have been filed, and presumptively served, well within four years of the date on which, even the Defendants concede, the Plaintiff's purported injury accrued. However, it appears that the Plaintiff's Complaint was not filed until February 22, 2001. At the Hearing, the Plaintiff acknowledged the discrepancy, and conceded that the Complaint was not filed until February 22, 2001.

Further, the Plaintiff claims that her injury accrued, within the meaning of the statute of limitations, when she was diagnosed with cancer, which was on March 21, 1997. Therefore, in analyzing the Defendants' statute of limitations defense, we must first determine the date on which the Plaintiff's injury accrued for statute of limitations purposes, and then decide when she commenced this action.

### a. *The Accrual Date.*

i) *Standard of Review.* "As a general rule, the cause of action accrues when the accident occurs." *Dalton v. Dow Chem. Co.,* 280 Minn. 147, 158 N.W.2d 580, 584 (1968). "It is obvious that injustices could result from an application of the occurrence-of-the-accident test to the situation where the injured party does not discover that he has suffered any injury until after the period of limitation has run." *Id.* " 'Quite recently there have been a wave of decisions meeting the issue head-on, and holding that the statute will no longer be construed as intended to run until the plaintiff has in fact discovered that he has suffered injury, or by the exercise of reasonable diligence should have discovered it.' " *Id.,* quoting Prosser, *Torts* (3 ed.) § 30.

This rule was adopted by the United States Supreme Court in *Urie v. Thompson,* 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282; see also, *Karjala v. Johns–Manville Products Corp.,* 523 F.2d 155, 160–61 (8th Cir.1975)("As in silicosis cases, there is rarely a magic moment when one exposed to asbestos can be said to have contracted asbestosis; the exposure is more in the nature of a continuing tort," and "[i]t is when the disease manifests itself in a way which supplies some evidence of causal relationship to the manufactured product that the public interest in limiting the time for asserting a claim attaches and the statute of limitations will begin to run").

As the Minnesota Supreme Court explained, in *Dalton:*

> The *Urie* case involved an F.E.L.A. claim arising out of an occupational disease, silicosis, caused by the continuous inhaling of silica dust. The court adopted the view of a california [sic] court that in this type of occupational disease case [ ] "no specific date of contact with the substance can be charged with being the date of injury, inasmuch as the injurous [sic] consequences of the exposure are the product of a period of time rather than a point of time; consequently the afflicted employee can be held to be 'injured' only when the accumulated effects of the deleterious substance manifest themselves."

*Dalton v. Dow Chem. Co.,* supra at 583, quoting *Associated Indemnity Corp. v. State Industrial Accident Comm'n,* 124 Cal.App. 378, 381, 12 P.2d 1075, 1076 (1932).

"Thus, the rule in the Federal Courts is that where injury is based on exposure to infectious or deleterious chemicals, the date upon which the statute of limitations begins to run is the date on which the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, his illness." *Id.;* see also, *Klempka v. G.D. Searle and Co.,* 769 F.Supp. 1061, 1065 (D.Minn.1991)("Under Minnesota law, two elements must be present for a cause of action to accrue for injuries related to a defective product: (1) a cognizable physical manifestation of the disease or injury, and (2) evidence of a causal connection between the injury or disease and the defendant's product, act or omission."), aff'd, 963 F.2d 168 (8th Cir. 1992), citing *Hildebrandt v. Allied Corp.,* 839 F.2d 396 (8th Cir.1987).

ii) *Legal Analysis.* Here, prior to March of 1997, the Plaintiff was unaware that she had cancer. Nor did she know, until March of 1997, that the Defendants' products were, at least in her view, causing her cancer, or causing what she had—prior to March of 1997—apparently believed was a sore on the bridge of her nose. Plainly, the Plaintiff's injury was not of a type that accrues when an accident occurs. As in cases dealing with silicosis and asbestosis, the Plaintiff's injury was, assertedly, the consequence of exposure to the Defendants' products over a period of time, rath-

er than at one point in time, and something of a continuing tort. As such, the Plaintiff was "injured" only when the accumulated effects of the allegedly deleterious substance manifested themselves in a way that manifested of a disease process in the nature of basal cell carcinoma.

Therefore, consistent with *Dalton,* since the Plaintiff's alleged injury was assertedly based upon her exposure to chemicals contained in the Defendants' products, the date on which the statute of limitations would begin to run was the date on which the Plaintiff discovered her illness. Here, the Plaintiff had no reason to suspect that the Defendants' products, or their alleged acts or omissions, were the cause of the sore on her nose, until her appointment with Dr. Heath, in March of 1997. Moreover, she was not diagnosed with basal cell carcinoma until March 21, 1997. Accordingly, we find that the Plaintiff's injury accrued on March 21, 1997, and we proceed to a determination of when this action was commenced for statute of limitations purposes.

b.  *The Commencement Date.*

■ i) *Standard of Review.* In determining whether the Plaintiff's claims are time-barred, we must first determine when the Plaintiff's "action commenced for statute of limitations purposes." *McKenzie v. Lunds, Inc.,* 63 F.Supp.2d 986, 1001–02 (D.Minn.1999). We apply Minnesota law on statute of limitations questions because, as a substantive matter, the statute of limitations is controlled by State law. See, *Larsen v. Mayo Foundation,* 21 Fed.Appx. 516, 517 (8th Cir.2001), citing *Hillary v. Trans World Airlines, Inc.,* 123 F.3d 1041, 1043 (8th Cir.1997); *Larsen v. Mayo Medical Center,* 218 F.3d 863, 866 (8th Cir. 2000), citing *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Guaranty Trust Co. v. York,* 326 U.S. 99, 110, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945); *MW Ag, Inc. v. New Hampshire Ins. Co.,*

107 F.3d 644, 646 (8th Cir.1997)(stating, "Federal courts follow state substantive law to determine when an action is commenced for statute of limitations purposes"), citing *Walker v. Armco Steel Corp.,* 446 U.S. 740, 752–753, 100 S.Ct. 1978, 64 L.Ed.2d 659 (1980).

■ Under Minnesota law, an action is commenced upon the service of process, irrespective of when the Complaint was filed. See *McKenzie v. Lunds, Inc.,* supra at 1001–02, citing *Rule 3.01, Minnesota Rules of Civil Procedure;* see also, *Metropolitan Fed. Bank of Iowa, F.S.B. v. W.R. Grace & Co.,* 999 F.2d 1257, 1261 (8th Cir.1993); *Concordia College Corp. v. W.R. Grace & Co.,* 999 F.2d 326, 328–29 (8th Cir.1993), *cert. denied,* 510 U.S. 1093, 114 S.Ct. 926, 127 L.Ed.2d 218 (1994). Moreover, State Rules for the service of process apply to pendant State claims. *Id.,* citing *Walker v. Armco Steel Corp.,* supra; *Anderson v. Unisys Corp.,* 47 F.3d 302, 309 (8th Cir.1995); *Appletree Square I v. W.R. Grace & Co.,* 29 F.3d 1283, 1286 (8th Cir.1994). In Minnesota, there are two means by which a plaintiff may effect service of a Summons and Complaint—either personally, pursuant to Rule 4.03, Minnesota Rules of Civil Procedure, or by acknowledgment of service by mail, pursuant to Rule 4.05, Minnesota Rules of Civil Procedure. See, *Nieszner v. St. Paul School Dist. No. 625,* 643 N.W.2d 645, 649 (Minn. App.2002), citing *Rule 4.05, Minnesota Rules of Civil Procedure; Turek v. A.S.P. of Moorhead, Inc.,* 618 N.W.2d 609, 611 (Minn.App.2000)("In Minnesota, a plaintiff may effectively serve a summons and complaint by two methods: personally under Minn.R.Civ.P. 4.03 or acknowledged by mail under Minn.R.Civ. P. 4.05").

ii) *Legal Analysis.* Here, Tiger Drylac was not served until June 14, 2001, and Dupont was not made a party to the action until February 4, 2002, and was not served

until February 15, 2002. As we have noted, the Plaintiff initially, and erroneously had argued, that she commenced this action on February 22, 1997, which is over a month prior to the date on which she asserts that her claim accrued, but her original Complaint was not filed until February 22, 2001. Notwithstanding the filing date, however, the Plaintiff is also mistaken in her belief that her action commenced upon the filing her Complaint, as strict liability, and breach of warranty, are State law causes of action, which are not commenced until the Summons and Complaint are served. As a result, since the Plaintiff's strict liability and breach of warranty claims accrued, in March of 1997, and the earliest date on which service of process was effected was June 14, 2001, we are compelled to find, as a matter of law, that those causes of action are time-barred, and we grant the Defendants' Motion for Summary Judgment, as to those claims, on that ground.[3]

2. *The Plaintiff's Consumer Fraud Act, False Advertising, and Consumer Product Safety Act Claims.*

The Defendants argue that the Plaintiff's Consumer Fraud Act, false advertising, and Consumer Product Safety Act claims, fail to state claims on which relief can be granted, and they assert that the Plaintiff can only recover injunctive, or equitable relief, if she is successful on those claims, and yet the Plaintiff has not prayed for those forms of relief in her Complaint. The Plaintiff concedes that she is not seeking injunctive, or equitable relief, and therefore, she has withdrawn those claims, and consequently, we grant the Defendants' Motions for Summary Judgment, as to the Plaintiff's Consumer Fraud Act, false advertising, and Consumer Product Safety Act claims.

These grants of Summary Judgment do not resolve the case, however, as the Plaintiff has asserted claims which are not time-barred, and which have not been voluntarily dismissed. As to those remaining claims, the Defendants seek an entry of Summary Judgment, arguing that, as a matter of law, the Plaintiff has failed to present a submissible case of causation for the Jury's consideration, and we proceed to that issue.

3. *Carcinogenicity and Causation.* The critical thrust of the Defendants' Summary Judgment Motions lies in their argument that the Plaintiff has failed to establish causation, which is an element of each cause of action she has alleged. As a part of that argument, the Defendants also contend that the Plaintiff has failed to establish the carcinogenicity of their products. In particular, the Defendants challenge the qualifications of the Plaintiff's expert, on whose opinions she has relied in order to support her claim that the Plaintiff's allegedly carcinogenic products caused her injury. Given the interconnection between the evidence required to prove that the Defendants' products were both carcinogenic, and the cause of the Plaintiff's injury, and that required to establish the requisite foundation for the Plaintiff's expert witnesses, we consider these arguments together.[4]

---

**3.** Having determined that Summary Judgment for the Defendants is warranted on limitations grounds, we do not address the Defendants' contention that the Plaintiff's breach of implied warranty claim is preempted by the Plaintiff's strict liability claim.

**4.** The Defendants also submit that the Plaintiff's misrepresentation claim is unsupported by evidence in the Record, and argue that the Plaintiff has produced no evidence of either a misrepresentation, or her reliance thereon. Given our disposition of the Defendants' causation and carcinogenicity challenges, a further discussion of this aspect of the Defendants' Motions is unnecessary.

a. *Standard of Review.* "To prove causation in a toxic tort case, a plaintiff must show both that the alleged toxin is capable of causing injuries like that suffered by the plaintiff in human beings subjected to the same level of exposure as the plaintiff, and that the toxin was the cause of the plaintiff's injury." *Bonner v. ISP Technologies, Inc.*, 259 F.3d 924, 928 (8th Cir.2001), citing *Wright v. Willamette Indus., Inc.*, 91 F.3d 1105, 1106 (8th Cir.1996); see also, *Mattis v. Carlon Electrical Prod.*, 295 F.3d 856, 860 (8th Cir.2002). "In other words, the plaintiff must put forth sufficient evidence for a jury to conclude that the product was capable of causing her injuries, and that it did." *Id.* Our Court of Appeals has held, however, that "[t]he first several victims of a new toxic tort should not be barred from having their day in court simply because the medical literature, which will eventually show the connection between the victims' condition and the toxic substance, has not yet been completed." *Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1208–09 (8th Cir.2000); see also, *Bonner v. ISP Technologies, Inc.*, supra at 928.

In other words, the Plaintiff does not "need to produce 'a mathematically precise table equating levels of exposure with levels of harm' in order to show" that she was exposed to a toxic level of the Defendants' products, "but only 'evidence from which a reasonable person could conclude'" that her exposure probably caused her injury. *Bednar v. Bassett Furniture Mfg. Co.*, 147 F.3d 737, 740 (8th Cir.1998), quoting *Wright v. Willamette Indus., Inc.*, supra at 1107; see also, *Bonner v. ISP Technologies, Inc.*, supra at 928. "If a properly qualified medical expert performs a reliable differential diagnosis through which, to a reasonable degree of medical certainty, all other possible causes of the victims' condition can be eliminated, leaving only the toxic substance as the cause, a causation opinion based on that differential diagnosis should be admitted". *Turner v. Iowa Fire Equip. Co.*, supra at 1209.

As explained by the Court, in *Glastetter v. Novartis Pharmaceuticals Corp.*, 252 F.3d 986, 990 (8th Cir.2001):

"In performing a differential diagnosis, a physician begins by 'ruling in' all scientifically plausible causes of the plaintiff's injury. The physician then 'rules out' the least plausible causes of injury until the most likely cause remains. The final result of a differential diagnosis is the expert's conclusion that a defendant's product caused (or did not cause) the plaintiff's injury."

The Courts, however, have been alert to recognize the distinct difference between a differential diagnosis, which is employed by a treating physician so as to identify the medical condition that required treatment, and "the type of *causal* diagnosis" which the legal community calls "differential." *Turner v. Iowa Fire Equip. Co.*, supra at 1208.

b. *Legal Analysis.* Here, the Plaintiff intends to introduce the testimony, at Trial, of two expert witnesses. First, the Plaintiff intends to proffer the testimony of Dr. Terry T. Martinez, Ph.D., who was retained by the Plaintiff in order to prove that the Defendants' products are carcinogenic, that is, the Plaintiff anticipates that Dr. Martinez will "rule in" the Defendants' products as the cause of her injury. Second, the Plaintiff plans to present the testimony of Dr. Paul M. Heath, her treating plastic surgeon, who first diagnosed the Plaintiff's condition as basal cell carcinoma, and who is expected to "rule out" the other causes for the basal cell carcinoma that the Plaintiff contracted.

The Defendants contest the admissibility of the experts' opinion testimony and, therefore, our threshold consideration relates to that issue and, if we find that the doctors have the requisite foundation to

support the opinions they voice, we must then decide whether those opinions are otherwise admissible, under Rule 702, Federal Rules of Civil Procedure.

i) *Standard of Review.* "The admissibility of expert testimony is governed, in large measure, by Rule 702, Federal Rules of Evidence, which provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case".

*Teska v. Potlatch Corp.*, 184 F.Supp.2d 913, 918 (D.Minn.2002), citing *Rule 702, Federal Rules of Evidence* (2001).[5]

"As the Supreme Court has explained, 'Rules 702 and 703 grant expert witnesses testimonial latitude unavailable to other witnesses on the "assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." ' " *Engleson v. Little Falls Area Chamber of Commerce*, 210 F.R.D. 667, 670 (D.Minn.2002), quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 148, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), quoting, in turn, *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). "When evaluating the admissibility of expert testi-

mony, a Court must look to both the relevance, and the reliability, of the proffered testimony." *Id.*, citing *Lauzon v. Senco Products, Inc.*, 270 F.3d 681, 686 (8th Cir. 2001); see also, *Daubert v. Merrell Dow Pharm., Inc.*, supra at 591–93, 113 S.Ct. 2786; *Bonner v. ISP Technologies, Inc.*, supra at 929; *Jaurequi v. Carter Mfg. Co.*, supra at 1082.

■ " 'When it comes to admission of expert testimony under the Federal Rules of Evidence, a trial judge has a gatekeeping responsibility to "ensur[e] that an expert's testimony rests on a reliable foundation and is relevant to the task at hand." ' " *Id.*, quoting *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 714–15 (8th Cir.2001), quoting, in turn, *Kumho Tire Co., Ltd. v. Carmichael*, supra at 141, 119 S.Ct. 1167. " 'Both the Eighth Circuit Court of Appeals and the Supreme Court have made clear that a person, although qualified as an expert in one area of expertise, may be precluded from offering opinions beyond that expertise, or that are not founded on a reliable methodology.' " *Teska v. Potlatch Corp.*, at 919, quoting *Smith v. Rasmussen*, 57 F.Supp.2d 736, 766 (N.D.Iowa 1999), citing *Kumho Tire Co., Ltd. v. Carmichael*, supra at 141, 119 S.Ct. 1167.

"Ultimately, 'it is the responsibility of the trial judge to determine whether a particular expert has sufficient specialized knowledge to assist jurors in deciding the specific issues in the case.' " *Id.*, quoting *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, supra at 715, 254 F.3d 706, citing *Kumho Tire Co., Ltd.*

---

**5.** Rule 703, Federal Rules of Evidence, also imposes the following restrictions on the provision of expert opinion evidence:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the

hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted.

*v. Carmichael,* supra at 156, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238. " 'Once initial expert qualifications and usefulness to the jury are established, however, a district court must continue to perform its gatekeeping role by ensuring that the actual testimony does not exceed the scope of the expert's expertise, which if not done can render expert testimony unreliable under Rule 702, *Kumho Tire,* and related precedents.' " *Id.,* quoting *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.,* supra at 715.

■ " '[B]efore accepting the testimony and opinion of an expert witness, the Trial Court is charged with the "gatekeeper" function of determining whether the opinion is based upon sound, reliable theory, or whether it constitutes rank speculation.' " *Id.,* quoting *Kemp v. Tyson Seafood Group, Inc.,* 2000 WL 1062105 at *2 (D.Minn. July 19, 2000), citing *Kumho Tire Co. v. Carmichael,* supra at 141, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238, and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* supra at 589–90, 113 S.Ct. 2786. " 'Expert testimony that is speculative is not competent proof and contributes "nothing to a legally sufficient evidentiary basis." ' " *Id.,* quoting *Concord Boat Corp. v. Brunswick Corp.,* 207 F.3d 1039, 1057 (8th Cir.2000), quoting, in turn, *Weisgram v. Marley Co.,* 528 U.S. 440, 454, 120 S.Ct. 1011, 145 L.Ed.2d 958 (2000).

"As the Court in *Kumho* made clear, the Trial Court's gatekeeping function is to be employed for all expert testimony." *Id.,* citing *Kumho Tire Co. v. Carmichael,* supra at 141, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 ("We conclude that Daubert's general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge."); see also, *Rule 702, Federal Rules of Evidence,* Advisory Committee Notes to 2000 Amendments ("Consistently with Kumho, the Rule as amended provides that all types of expert testimony present questions of admissibility for the trial court in deciding whether the evidence is reliable and helpful.").

"In the final analysis, '[i]n order to be helpful to the trier of fact, the witness must be qualified as an expert, the expert must have a reasonable factual basis for their testimony, the testimony must be based on reliable methods, and the testimony must be relevant to the facts at issue.' " *Engleson v. Little Falls Area Chamber of Commerce,* supra at 671, quoting *Kemp v. Tyson Seafood Group, Inc.,* supra at *2. As the Supreme Court, in *General Electric Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997), succinctly observed:

> Trained experts commonly extrapolate from existing data. But nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply to great an analytical gap between the data and the opinion proffered.

With these precepts in mind, we turn to the Plaintiff's proffered expert testimony.

ii) *Legal Analysis.* Since they involve somewhat different considerations, we separately address the proposed opinions of Dr. Martinez, and Dr. Heath.

■ A) *Dr. Martinez.* Dupont argues that Dr. Martinez is not qualified to testify that exposure to powder coatings actually caused the Plaintiff's basal cell carcinoma, and Dupont concludes that, "[t]herefore, due to his lack of medical expertise, the scope of Dr. Martinez's testimony must be limited to the question of general causation: whether exposure to [Dupont's] product is capable of causing basal cell

carcinoma in general." *Memorandum of Law in Support of Dupont Powder Coatings U.S.A., Inc.'s Amended Motion for Summary Judgment*, at 10. Dr. Martinez, however, was retained by the Plaintiff for precisely that purpose. See, *Plaintiff's Memorandum of Law in Opposition to Defendants' Summary Judgment Motions*, at 8 (arguing that the Plaintiff "meets her burden of proof showing that the chemicals contained in the powder paint products of Dupont and Tiger are capable of causing cancer based on the expert opinion of Dr. Terry Martinez").

Dupont admits that "Dr. Martinez's toxicology training generally qualifies him to testify on the toxicity of a given agent." See, *Memorandum of Law in Support of Dupont Powder Coatings U.S.A., Inc.'s Amended Motion for Summary Judgment*, at 11. Indeed, Dr. Martinez survived a *Daubert* challenge in this Circuit, as reflected in *Bonner v. ISP Technologies, Inc.*, supra at 930, but only as to the causation of the acute sequella of a closely preceding exposure to a toxin, and not as to the purported chronic sequella of that exposure. Accordingly, we find that Dr. Martinez is generally qualified to testify as to whether a known substance is capable of causing the type of injury, from which the Plaintiff has suffered. However, since Dr. Martinez is not a medical doctor, his testimony should be confined to analyzing the carcinogenicity, if any, of the Defendants' products, and he would not be permitted to venture into the etiology of basal cell carcinoma. See, *Martinez Deposition*, at p. 25, and 27.

1) *Carcinogenicity.* Having determined that Dr. Martinez has the foundation to testify on matters concerning the toxicity of known substances, we turn to the relevance, and reliability, of Dr. Martinez's proposed testimony. The Plaintiff contends that "[t]oxicologist and pharmatologist Dr. Martinez provides the requisite expert opinion that daily skin exposure to nickel, chromium and TGIC is capable of producing cancer in humans." *Id.* at 9. For this proposition, the Plaintiff non-specifically cites to the deposition testimony of Dr. Martinez, in its entirety. See, *Plaintiff's Memorandum*, at p. 9 ("See depo testimony of Dr. Martinez."). We have parsed the deposition testimony of Dr. Martinez, notwithstanding the observation of at least one Court that "judges are not like pigs, hunting for truffles buried in briefs," but have found nothing in the nature of the "truffle" to which the Plaintiff alludes. *United States v. Dunkel*, 927 F.2d 955, (7th Cir.1991); *United States v. Stuckey*, 255 F.3d 528, 531 (8th Cir.2001), cert. denied, 534 U.S. 1011, 122 S.Ct. 498, 151 L.Ed.2d 409 (2001)(citing favorably to *Dunkel*).

We have uncovered no expression of an opinion by Dr. Martinez, which is specific to the Defendants' powder paint products that are the subject of this litigation. Rather, Dr. Martinez generically testifies to the carcinogenicity of nickel and chromium. In that respect, we have exhumed, from the doctor's deposition, the following exchange:

Q: [Y]ou say that the powder paint products contain known sensitizers, irritants and carcinogens, specifically T.G.I.C., chromium and nickel; could you tell me which [ ] one of these is a sensitizer, which one is an irritant, which one is a carcinogen or are all three of them?

A: All right, let's see, I think to greater and lesser extent they all three of them would be in all three categories. * * * [Nickel's] propensity to cause cancer are [sic] well-documented.

*Martinez Deposition*, at 69–70.

Earlier in that same deposition, the doctor testified as follows:

Q: So have you offered an opinion in [the welding rods] case that nickel and/or chromium caused cancer?

A: Yes.

*Id.* at 62.

For its part, Tiger Drylac argues that its product—49/42330—does not contain nickel, or chromium, and Dr. Martinez has agreed with that assertion. *Id.* at 137. Thus, of the chemical culprits, which have been listed by Dr. Martinez, Tiger Drylac's product only contains TGIC, which the doctor concedes is not a proven carcinogen. *Id.*

When asked whether a product, which only contained TGIC, and not nickel, or chromium, was carcinogenic to a reasonable degree of scientific certainty, Dr. Martinez responded:

I couldn't say that, to a reasonable degree of scientific certainty unless there were other known carcinogens, like nickel and chromium attached. Evidence isn't good enough for TGIC a loan [sic].

*Id.* at 133–34.

Given the testimony of Dr. Martinez, it is plain that he has no competent opinion as to the carcinogenicity of TGIC, which is in Tiger Drylac's product, and therefore, we grant Summary Judgment to that Defendant, as the Record does not support the Plaintiff's assertion that Tiger Drylac's product is carcinogenic.[6]

While Dupont does not contest that it's product contains nickel, chromium, and TGIC, it takes strong exception to the notion that the mere presence of those components is sufficient to label its paint product as carcinogenic. We find that exception to have merit, for Dr. Martinez's proposed testimony is thoroughly undermined by fatal deficiencies. Not the least of those deficiencies is the restricted effort Dr. Martinez expended in order to obtain a foundation for the opinions that he proposes to express. For example, he never interviewed, examined, or even talked to the Plaintiff. *Martinez Deposition*, at pp. 28 and 125. He never viewed, let alone inspected, the Plaintiff's workplace, or her employer's industrial hygiene practices. *Id.* at p. 123–24. Nor has he had any past experience in researching powder coatings, such as the Defendants' products. *Id.* at p. 41–42.

All that Dr. Martinez did, before reaching the opinions he has expressed, was to read the file materials which Plaintiff's counsel transmitted to him, see *Exhibit E to Affidavit of DeAnna M. McCashin dated October 4, 2002*, and conduct a literature search on nickel, chromium, and TGIC. *Id.* at p. 29. In his literature search, Dr. Martin did not obtain full copies of any articles, but simply read the abstracts of the articles found. *Id.* at pp. 103 and 129. Notably, none of the ab-

---

**6.** On the day following his deposition, Dr. Martinez transmitted a letter to the Plaintiff's attorney, in which he expressed what could best be characterized as testifier's remorse. See, *Exhibit H, to Affidavit of DeAnna M. McCashin of October 4, 2002.* Even if the letter were a sworn attestation, which it is not, we would not alter our conclusion, that Summary Judgment be entered for Tiger Drylac, as the contents do not substantively change the testimony of Dr. Martinez at his deposition. To the extent that Dr. Martinez's testimony could be construed to suggest a combined effect from the Plaintiff's exposures to both Defendants' products, such that ab-

sence of nickel and chromium in Tiger Drylac's product is compensated by the content of DuPont's product, the opinion is at worst overreaching and, at best, without foundation. We are aware of no evidence upon which the doctor could legitimately conclude that the Plaintiff was simultaneously exposed to both of the Defendants' products.

We also make plain that, even if we concluded that TGIC were carcinogenic, a proposition that is not supported by this Record, we would, nonetheless, enter Summary Judgment for Tiger Drylac for the same reasons, which we detail in the text of this opinion, that we grant Summary Judgment to DuPont.

stracts related to an exposure to powder coatings. *Id.* at 102. In total, Dr. Martinez expended four hours in drawing the opinions that the Plaintiff has disclosed. *Id.* at 123. Given the superficial research, in which Dr. Martinez engaged, it is not surprising that the results of that research are so substantively inconsequential.

Dr. Martinez has never conducted bench research on nickel or chromium, *id.* at 58–59, much less on the Defendants' products. Rather, he relied, as have all of the parties, on the Material Safety Data Sheets ("MSDS") in order to determine the chemical components of the Defendants' powered coatings. The MSDS for DuPont's product discloses that it contains zero percent, by weight, of both chromium and nickel. See, *Exhibit D to the Affidavit of DeAnna M. McCashin dated October 4, 2002.* In other words, chromium, and nickel, are present in DuPont's powdered paint, to which the Plaintiff was exposed, in trace amounts. In chemistry, a trace relates to "an amount of a chemical constituent not always quantitatively determinable because of minuteness." *Merriam–Webster's Collegiate Dictionary,* Merriam–Webster, Inc., Springfield, Massachusetts (10th Edition, 2001), at p. 1245. Since Dr. Martinez read none of the articles which his literature research uncovered, and the abstracts to those articles are less than enlightening, he has present-

ed no basis to believe that either chromium, or nickel, are carcinogenic without reference to dosage. See, *Exhibit I to Affidavit of DeAnna M. McCashin dated October 4, 2002.*

That is not to say, however, that the matter of dosage is unimportant to Dr. Martinez, for he agreed, during the course of his deposition, that, in toxicology, "dose response is a key issue"—"[h]ow much will produce harm, what will produce harm and at what quantity." *Martinez Deposition,* at p. 20. Nor did Dr. Martinez object to the notion, in toxicology, that "dose makes the poison." *Id.* Nonetheless, Dr. Martinez makes no effort to isolate the doses of DuPont's product to which the Plaintiff was exposed. Notwithstanding these two key unknowns—that is, what amount of chromium or nickel is contained in DuPont's product, and what amount of exposure did the Plaintiff have to that product—Dr. Martinez has blithely concluded that DuPont's product, or Tiger Drylac's, for he does not distinguish between the two, caused the basal cell carcinoma that the Plaintiff contracted.

Resort to the Plaintiff's deposition, which was the only source of such dosage information that was available to Dr. Martinez, does not provide much guidance as to the level of exposure, to DuPont's product, to which the Plaintiff's nose was exposed. *Martinez Deposition,* at p. 91.[7]

---

**7.** During the course of his deposition, Dr. Martinez testified as follows:

Q. Now do you have any information that or any evidence that the plaintiff in this case was exposed to levels of these compounds in excess of those occupational exposure limits?

A. As far as I know that specific information is not in this file. I don't know if any of that information even exists, or if the reading were ever taken. I do know in most industries those readings are not taken.

*Martinez Deposition,* at p. 91.

We are mindful that, in response to the Defendants' Summary Judgment Motions, the Plaintiff has submitted a supplemental Affidavit which, in part, addresses the issue of powdered coatings in her workplace. We are not deciding, here, whether effective industrial hygiene practices were employed by the Plaintiff's employer, for we are confronted with the Defendants' contention that Dr. Martinez's opinions are not competent and well-founded. Since Dr. Martinez formulated his opinions on the Plaintiff's deposition testimony, reliance on the information, which is contained in her supplemental Affidavit, would be improper. See, *Savage v. Union Pacific Rail-*

According to the Plaintiff, she always wore a hood while she was painting with a powdered coating, and the hood prevented the powdered spray from reaching her face. *Medalen Deposition,* at pp. 76–77. Moreover, at any time she had a sore on her nose, she placed a band-aid over the sore while painting so as to keep powdered spray product from reaching that spot. *Id.* at pp. 81–82. Given the fact that the Plaintiff's hands were uncovered, and in close proximity to the powdered spray, while her face was fully protected, neither the Plaintiff, nor either of her experts, advances any plausible explanation as to why, in light of the dosage issue, the Plaintiff did not contract skin cancer on her hands.

Of course, we recognize that, in toxic tort cases, the plaintiff need not "produce a 'mathematically precise table equating levels of exposure with levels harm,'" *Bednar v. Bassett Furniture Mfg. Co.,* supra at 740, quoting *Wright v. Willamette Indus., Inc.,* supra at 1107, for "a plaintiff need only make a threshold showing that he or she was exposed to toxic levels known to cause the type of injuries he or she suffered." *Mattis v. Carlon Electrical Products,* 295 F.3d 856, 860–61 (8th Cir. 2002); *National Bank of Commerce v. Associated Milk Producers, Inc.,* 191 F.3d 858, 862 (8th Cir.1999). Here, Dr. Martinez has failed to make the requisite threshold showing of exposure "from which a reasonable person could conclude that [the] defendant's [action] has probably caused' the harm about which they complain." *National Bank of Commerce v. Associated Milk Producers, Inc.,* supra at 862, citing *Bednar v. Bassett Furniture Mfg. Co.,* supra at 740. Although "[i]t is sufficient for a plaintiff to prove that she was exposed to a quantity of toxin that 'exceeded safe levels,'" Dr. Martinez has made no such showing here. *Bonner v.*

*road Co.,* 67 F.Supp.2d 1021, 1037 (E.D.Ark.

*ISP Technologies, Inc.,* supra at 931, quoting *Wright v. Willamette Indus., Inc.,* supra at 1106. Since "knowledge of the extent of exposure to a potentially harmful substance is essential to any reliable expert opinion that the particular substance caused a disease," Dr. Martinez's causation opinion "is not scientifically valid when it is based upon wholly insufficient data." *Savage v. Union Pacific Railroad Co.,* 67 F.Supp.2d 1021, 1031, 1037 (E.D.Ark.1999)(rejecting expert's opinion, that basal cell carcinoma was caused by exposure to creosote where, as here, the exposure data was insufficient).

While Dr. Martinez claims that a temporal connection links the Plaintiff's exposure to powdered coatings with her basal cell carcinoma, he has provided no basis upon which to say what that temporal relationship is, or where it was derived. *Martinez Deposition,* at pp. 33 and 81–82. Unlike his testimony in *Bonner,* where the plaintiff suffered immediate biological reactions following her exposure to the claimed toxin, here, the Plaintiff has identified no "specific incident where [she] had some irritation of the nose from the fall of 1996 until March of 1997 of being exposed to a powder spray product and having it irritate [her] nose." *Medalen Deposition,* at p. 83. As our Court of Appeals has recognized:

> Under some circumstances, a strong temporal connection is powerful evidence of causation. See, *Heller* [*v. Shaw Indus.*], 167 F.3d [146,] 154 (3rd Cir.1999) ]("if a person were doused with chemical X and immediately thereafter developed symptom Y, the need for published literature showing a correlation between the two may be lessened"). We recognize, as did the district court, that Dr. Martinez considered case reports, which this court held in Turner are not "generally considered reliable evidence

1999).

of causation," 229 F.3d at 1209 n. 5, among other factual bases in forming his opinion. The district court considered this shortcoming in Dr. Martinez's testimony, but determined that the immediacy of Bonner's acute symptoms to her exposure made Dr. Martinez's opinion on causation reliable enough to pass Rule 702 muster.

*Bonner v. ISP Technologies, Inc.,* supra at 931.

Without knowing the latency period, between the Plaintiff's exposure to one carcinogen, or another, and the onset date of her basal cell carcinoma—and Dr. Martinez provides neither—there is no logical way that the doctor could conclude that a temporal relationship existed between the Plaintiff's non-acute exposure to powdered coatings, as opposed to her exposure to liquid paints, or sunlight, to name but two other complicating environmental agents, and the incurrence of her basal cell carcinoma.[8]

Notably, Dr. Martinez offers nothing to link powdered coatings to basal cell carcinoma. To be sure, he categorically labels chromium and nickel as carcinogens but, even as to those chemicals, he has failed to cite one study which ties their exposure to basal cell carcinoma. As to powdered coatings, Dr. Martinez conceded that he was aware of no published literature "indicating that someone developed a basal cell carcinoma from exposure to powder coatings," and he has offered no case reports, or epidemiological literature, that does. *Martinez Deposition,* at pp. 113–14. Nor has Dr. Martinez offered any other study, animal toxicity trial or otherwise, to so much as suggest that powdered coatings cause basal cell carcinoma.[9] Indeed, he

---

8. As the Court explained, in *Maughan v. SW Servicing, Inc.,* 758 F.2d 1381, 1385 (10th Cir.1985):

   In cases involving suspected carcinogens, the first "injury" occurs when the first cancer cells silently begin their evolution in the body. Often the first symptoms of the injury will not appear for some time. Thus "injury" in the sense of symptoms or suffering may appear much later than the actual onset of disease induced by a carcinogen, and in many cases not until after the applicable statute of limitations has lapsed.

   Although not addressed by Dr. Martinez, the latency of carcinogens, is a factor commonly considered in occupational exposures. In *International Union, United Automobile, Aerospace & Agricultural Workers of America v. Occupational Safety & Health Admin.,* 938 F.2d 1310, 1313 (D.C.Cir.1991), citing *Chevron U.S.A. Inc. v. N.R.D.C.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Court observed as follows:

   OSHA interprets [Title 29 U.S.C. § 655(b)(5)] as applicable only to "health" standards. It views these as coextensive with standards governing latent hazards, such as carcinogens, "which are frequently undetectable to the casual observer because they are subtle or develop slowly or after latency periods," Brief of OSHA at 24, and

   contrasts them with "safety" standards, such as the lockout regulation, which address hazards that cause immediately visible physical harm. We accord considerable weight to an agency's construction of a statutory scheme it is entrusted to administer, rejecting it only if unreasonable. Insofar as we can discern, Dr. Martinez either ignored, or disregarded, the latency question, and presumed a temporal nexus, between the Plaintiff's exposure to powdered coatings, and the onset of her basal cell carcinoma. In contrast, Dr. Heath plainly recognized the latency period for sun-induced skin cancer. *Heath Deposition,* at p. 28 ("It's a long history of [sun exposure] over generally many years, and generally there's quite a lag time," as "[f]rom the history of sun exposure there's further lag time of 10 or 20 years * * *.").

9. Exemplifying the doctor's lack of knowledge as to the bio-availability of the components of the powdered coatings, which he regards as carcinogenic, is the following exchange:

   Q. Have you conducted any studies or are you aware of any studies regarding the effect of mixing TGIC, chromium or nickel with a polyester resin on their toxicity?

   A. Not specifically at this time.

   Q. Dr. Martinez, what does bioavailability mean as it's used in the scientific text?

fully admits that he has not determined whether the TGIC, chromium, and nickel, which are contained in DuPont's product, are so bound with polyester resin so as not to be bioavailable. *Martinez Deposition*, at pp. 137–140.

> A. It means that the chemical is able to be absorbed and distributed and get to the site of action, bioactivity.
> Q. And for one of these compounds to be bioavailable it must be unbound, is that correct?
> A. It is easier, general rule is a chemical has greater ability to cross biological membranes if it is uncharged, a small size, not in complex with things.
> Q. And that's what you mean by unbound, is that correct, that is—
> A. That's my interpretation of what you meant by unbound.
> Q. Okay, and so if the chemical is bound with a polyester resin it would not be bioavailable, is that correct?
> A. May or may not be, let's test it and find out.

*Martinez Deposition*, at pp. 137–38.

As a consequence, Dr. Martinez was unable to state an opinion as to the degree to which the components of powdered coatings, that he regards as carcinogenic, are bioavailable.

10. We claim no expertise in toxicology, but we are convinced that Dr. Martinez applied no recognized methodology in reaching his causation opinion, much less a scientific one. See, e.g., *In re TMI Litigation Cases*, 922 F.Supp. 1038, 1044 (M.D.Pa.1996) (accepting the methodology of a toxicologist who, unlike Dr. Martinez, "look[ed] at the dose," "the dose response," an "adequate latency period," and "confounding, contributing factors"). By way of further example, when considering whether a suspected chemical is either a "known" or "reasonably anticipated to be" a human carcinogen, toxicologists commonly consider scientific factors as opposed to Dr. Martinez's expression of personally held beliefs. In *Tozzi v. United States Dept. of Health and Human Services*, 271 F.3d 301, 304 (D.C.Cir.2001), the Court quoted the guidelines, which are employed by the Health and Human Services' National Toxicology Program, in listing and delisting a substance as carcinogenic, as follows:

> Conclusions regarding carcinogenicity in humans or experimental animals are based on scientific judgment, with consideration given to all relevant information. Relevant information includes but is not limited to dose response, route of exposure, chemical structure, metabolism, pharmokinetics, sensitive sub populations, genetic effects or other data relating to mechanism of action or factors that may be unique to a given substance for which there is evidence of carcinogenicity in laboratory animals but there is compelling data indicating that the agent acts through mechanisms which do not operate in humans and would therefore not reasonably be anticipated to cause cancer in humans.

Quite plainly, Dr. Martinez neither addresses these relevant considerations, but substitutes assumption for probative evidence. As but one example, without any showing of expertise in anatomy, Dr. Martinez presumes that the linkage of nickel, to carcinoma at one anatomic site, establishes carcinogenicity at other sites. *Martinez Deposition*, at p. 88 ("If you look on page two, inhalation, there's a statement, 'Chronic exposure to nickel dust may cause carcinoma and things as paranasal sinuses, larynx, and lungs,'" and "[w]e know that that doesn't say basal cell carcinoma, but it does say carcinoma, and there isn't much difference between the lining of larynx, the lung and the paranasal sinuses and the epidermal layer on the bridge of your nose."). If Dr. Martinez's conclusive presumption, that the epidermal layers of the human body are as susceptible to the assumed carcinogenic properties of nickel, then the Plaintiff's basal cell carcinoma would have been far more likely to have been situated on her wholly unprotected hands, than on the bridge of her nose, which was insulated from nickel by both an effective hood, and a band-aid. More importantly, the Occupational Health and Safety Administration would scarcely require a chemical manufacturer to issue, and update, MSDSs which specify the "primary route(s) of entry" of the chemical into the human body, if the route of entry was unnecessary, as Dr. Martinez presumes. See, *Messer v. Amway Corp.*, 210 F.Supp.2d 1217, 1223 n. 8 (D.Kan. 2002), citing *29 C.F.R. § 1910.1200(g)*.

■ We accept, under Eighth Circuit jurisprudence, that an expert in a toxic tort action, need not, necessarily, support his or her causation opinion with published studies, epidemiological studies, or animal studies.[10] See, *Bonner v. ISP Technolo-*

*gies, Inc.,* supra at 929; *Glastetter v. Novartis Pharmaceuticals Corp.,* supra at 992. Nevertheless, the expert must offer something other than rank conjecture, and his or her own say-so. See, *General Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data by the ipse dixit of the expert."). Here, Dr. Martinez has advanced pure hypothesis, and not "good science." *Bonner v. ISP Technologies, Inc.,* supra at 932, quoting *National Bank of Commerce v. Associated Milk Producers Inc.,* supra at 862–63. Unlike his "novel" opinion, in *Bonner,* here we are presented with nothing but sheer fiction.

■ In sum, we find Dr. Martinez's causation opinion to be without either relevance, or reliability. "Expert evidence is relevant if it helps 'the trier of fact to * * * determine a fact in issue,'" and "[f]or such evidence to be relevant, in other words, there must be 'a valid scientific connection' to the pertinent inquiry as a precondition to admissibility." *Group Health Plan, Inc. v. Philip Morris Inc.,* 188 F.Supp.2d 1122, 1130 (D.Minn.2002), quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* supra at 591–92, 113 S.Ct. 2786. Dr. Martinez offers his guess and, in our considered view, not even an educated one, that the Plaintiff's basal cell carcinoma was caused by the Defendants' powdered coatings, but that guess is an empty shell, buoyed by nothing other than surmise and conjecture. Accordingly, the Defendants are entitled to Summary Judgment on the causation issue, as Dr. Martinez has failed to "rule in" the Defendants' products as the cause of the Plaintiff's skin cancer.[11] Nonetheless, in light of some suggestion by the Plaintiff, that Dr. Heath "ruled in" the Defendants' products as the cause of her cancer, as well as having "ruled out" other causes, we proceed to an analysis of his testimony.

■ B. *Dr. Heath.* Dupont argues that Dr. Heath's testimony should be excluded from our consideration of the Defendants' Motions as "the doctor arrived at his opinion 'more as an afterthought' and 'in an ad hoc manner,'" and that Dr. Heath's opinion "lacked the reliability required of a legal differential diagnosis." *Memorandum of Law in Support of Dupont Powder Coatings U.S.A., Inc.'s Amended Motion for Summary Judgment,* at 25, quoting *Turner v. Iowa Fire Equip. Co.,* supra at 1208. In addition, Dupont maintains that "Dr. Heath has no expertise in the toxicology of powder coatings and relied on nothing more than the MSDS for Silver Horn II in forming his opinion." *Id.* at 26, citing *Plourde v. Gladstone,* 190 F.Supp.2d 708, 720 n. 5 (D.Vt. 2002) (refusing to consider testimony from the plaintiff's treating doctors on grounds that there was "no indication that they possess any skills, experience, knowledge or training regarding any of the chemicals used by Defendants apart from the infor-

---

11. "We start with the fundamental proposition that the existence of a causal connection between exposure to a certain chemical and an alleged injury requires specialized expert knowledge and testimony since such matters are not within the common knowledge of lay persons." *Savage v. Union Pacific Railroad Co.,* supra at 1030, citing *Schmaltz v. Norfolk & Western Railway Co.,* 896 F.Supp. 180 (N.D.Ill.1995). Since, here, the claimed injury is a "sophisticated" one, " 'proof of causa-

tion is not within the realm of lay understanding and must be established through expert testimony.'" *Turner v. Iowa Fire Equip. Co.,* 229 F.3d 1202, 1210 (8th Cir.2000); see also, *Robinson v. Hager,* 292 F.3d 560, 564 (8th Cir.2002). As a result, the Plaintiff's failure to offer expert opinion testimony to "rule in" the Defendants' products as the cause of her basal cell carcinoma is fatal to her causes of action.

mation contained on product labels and Material Safety Data Sheets").

Specifically, Dupont contends that Dr. Heath's testimony should be excluded because Dr. Heath failed to perform a valid differential diagnosis, as to the cause of the Plaintiff's skin cancer, as he was properly concerned with diagnosing whether a cancer was present, and how it should be treated. As we have previously detailed, in *Turner*, the Court of Appeals affirmed the District Court's exclusion of a treating physician's causation opinion, as the doctor had "acknowledged that the differential diagnosis he performed was for the purpose of identifying [the plaintiff's] *condition,* not its *cause*," and further "admitted that he made no attempt to consider all the possible causes until only one remained, or to consider which of two or more non-excludable causes was the more likely to have caused the condition." *Turner v. Iowa Fire Equip. Co.*, supra at 1208 [emphasis in original]. Explaining further, the Court reasoned, in part, as follows:

> Unlike his diagnosis of condition, Dr. Hof's causation opinion was not based upon a methodology that had been tested, subjected to peer review, and generally accepted in the medical community. Significantly, Dr. Hof did not systematically rule out all other possible causes. He was clearly more concerned with identifying and treating [the plaintiff's] condition than he was with identifying the specific substance that caused her condition. Dr. Hof arrived at his opinion about baking soda more as an afterthought, in an ad hoc manner, only after being informed that he had misidentified NH sub4 H sub2 PO sub4 as one of the extinguisher's ingredients.

*Id.*

In response, the Plaintiff argues that Dr. Heath's medical opinion is based upon a proper differential diagnostic, and asserts that Dr. Heath, in his deposition testimony, explained the basis for the differential diagnosis, which led to his conclusion that the Plaintiff's exposure to the Defendants' powder paint products had caused her basal cell carcinoma. See, *Plaintiff's Memorandum of Law in Opposition to Defendants' Summary Judgment Motions,* at 9.

According to the Plaintiff, Dr. Heath excluded exposure to sun light, which is the most common cause of skin cancer, after he considered that the Plaintiff was relatively young for the development of skin cancer due to long-term sun exposure; had no family history of skin cancer; was a brunette with brown eyes; and had an open sore develop on the bridge of her nose from wearing safety goggles, which provided an opening into the inner tissue of the Plaintiff's nasal epidermis—the exact site at which the basal cell carcinoma appeared. *Id.*; see also, *Plaintiff's Ex. C* (Dr. Heath's clinical records, dated April 3, 1997).

The Plaintiff urges that Dr. Heath also considered the data that had been provided to him concerning the chemicals found in the powdered coatings, which were in direct contact with the Plaintiff's skin, when he opined that the Plaintiff's exposure to the powdered coatings was more likely than not the cause of her basal cell carcinoma. *Id.* at 9–10; see also, *Plaintiff's Ex. C* ("I think it may be quite likely that the chronic irritation from paints at her place of employment has played a role in the development of this"). In contrast, Dupont maintains that Dr. Heath's primary concern was in identifying the appropriate treatment for the Plaintiff's condition, and was not devoted to a determination of the cause of that condition. See, *Memorandum of Law in Support of Dupont Powder Coatings U.S.A., Inc.'s Amended Motion for Summary Judgment,* at 25.

At the time of his deposition, Dr. Heath engaged in the following colloquy with defense counsel:

Q: I guess what I am focusing on is the etiology of the basal cell carcinoma. Did you attempt to determine the etiology of that basal cell carcinoma?

A: I didn't attempt to determine it, because it really wouldn't impact her treatment. I simply suggested that if something is causing irritation in the area of the cancer, that it might be wise to look at avoiding further exposure to that.

*Dr. Heath's Deposition,* at 26.

\* \* \* \* \* \*

Q. So let me go back to when you initially started treating this patient. You indicated that you really didn't attempt to determine etiology, because it wasn't going to affect how you treated the tumor; is that correct?

A. That's correct, other than to assume that that might have been a factor, and to tell her that it would be wise to avoid further exposure.

Q. At what point did you undertake to determine that, yes, the powder paint was the causative factor in this case?

A. I didn't attempt to determine it, other than asking her if she wanted— or suggested to her that she check the MSDS sheet on the paint that she was using.

Q. What I'm asking you is, when did you move from not really being concerned about the etiology to actually having an opinion one way or the other?

A. Well, I guess I had an opinion from the beginning that there was some suspicion there.

Q. What moved you from the point of having some suspicion that this was involved to being reasonably certain, as you testified, that this powder paint was, in fact, the cause of the tumor in this case?

A. I believe when she brought that MSDS sheet in. It should be recorded in one of the notes.

Q. So the MSDS was really the turning point in your causal assessment.

A. Uh-huh.

Q. Is that a "yes"?

A. Yes.

*Id.* at pp. 28–30

As was the circumstance in *Turner,* in his role as the Plaintiff's treating physician, Dr. Heath was appropriately concerned with the treatment of the Plaintiff's condition, and not with the investigation of its cause. See, *Turner v. Iowa Fire Equip. Co.,* supra at 1208.

Moreover, Dr. Heath's deposition testimony underscores the absence of any methodology, on his part, for ascertaining causation, which had been tested, had been subjected to peer review, or was generally accepted in the medical community. This is not surprising, for Dr. Heath candidly distanced himself from expertise in the etiology of cancer,[12] and as to detailed foundational knowledge about those factors which we have previously detailed, in our discussion of Dr. Martinez's opinion, which critically influence a causation analysis. For example, Dr. Heath disclaimed any knowledge concerning the doses of powdered coatings to which the Plaintiff was exposed. *Heath Deposition,* at pp. 24–25. He did no "independent research into any of the medical issues surrounding this case," and had "no training in toxicolo-

---

12. When questioned as to his expertise in the etiology of cancer, Dr. Heath testified that he "wouldn't say [he was] an expert, but [he had] some knowledge." *Heath Deposition,* at p. 17.

gy beyond the standard medical program." *Id.* at 16–17. The limited, cursory nature of Dr. Heath's causation analysis is reflected in the following exchanges:

Q.    * * * Are you aware of any published case reports of anyone developing a basal cell carcinoma as a result of an exposure to a powder coating product?

A.    No, I'm not.

Q.    Are you aware of any epidemiology on that subject?

A.    No, I'm not.

Q.    I believe we established earlier that you don't have a real concrete sense of how much powder Ms. Medalen was exposed to?

A.    No, I don't.

Q.    Have you discussed this case with any of your colleagues?

A.    I don't recall that I have.

*Id.* at p. 48.

\*        \*        \*        \*        \*        \*

Q.    Did you do any independent research regarding the chemical composition of the powder spray coatings that Ms. Medalen reported she would have been exposed to?

A.    No, I didn't.

Q.    So you simply looked at the MSDS sheet and said that there's an indication that these are possible carcinogens, therefore they should be avoided?

A.    That was my opinion.

Q.    Whether or not they actually are carcinogens, you don't have any expert opinion; is that a fair statement?

13.    Elsewhere, Dr. Heath further testified as follows:

  Q.    As I understand it, you don't know, based on your own scientific knowledge, whether or not the powder spray coatings are actually carcinogenic, correct?

  A.    Beyond what I read in the MSDS sheet, no.

A.    Beyond what it says in the MSDS sheet, which I'm just getting a chance to look at right now, and I haven't seen since 1997.

Q.    * * * What I'm trying to find out is whether you've done any independent analysis to determine whether or not the powder spray coatings are carcinogens?

A.    No, I haven't.

Q.    So you simply looked at the MSDS sheets and said, because these MSDS sheets say that the powder spray coatings are possible carcinogens, they should be avoided?

A.    I believe that was my reasoning at the time for telling her to try and avoid them.

Q.    Does that remain your reasoning today?

A.    Yes.

Q.    Since you first met with Ms. Medalen and discussed this issue with her, have you done any other research regarding whether or not the powder spray coatings are carcinogens?

A.    No.

*Id.* at pp. 51–52.

Quite plainly, Dr. Heath has no competent foundational basis to "rule in" powder coatings as the cause of the Plaintiff's cancer.[13] While, as a treating physician, Dr. Heath has had his suspicions, and while he has encouraged the Plaintiff to avoid contact with such coatings on the basis of those suspicions, such cautionary measures are the staple of the treating physician, and not the proof of a cause and effect, biological reaction.

  Q.    Do you have any understanding as to the specific compounds in the powder spray coating that could be characterized as carcinogenic?

  A.    No.

  *Id.* at pp. 51–52.

Similarly, we have no competent showing that, on a systematic and scientific basis, Dr. Heath "ruled out" the other potential causes of the Plaintiff's skin cancer. Again, we turn to the testimony of Dr. Heath:

Q. Let me talk to you about the factors that you at least considered or thought about in the course of this, and make sure I've identified all of them first, and then I'll come back and narrow the field and discuss some things. The potential causative factors that you considered were skin irritation, genetic predisposition, exposure to chemical compounds in the workplace, and radiation; fair statement?

A. I guess some things come to mind. I guess I didn't evaluate them thoroughly, because I didn't record a family history, so I didn't really evaluate the genetic aspect of that.

Q. * * * As I understand it, Ms. Medalen was referred to you for purposes of treating a known basal cell carcinoma, correct?

A. That's right.

Q. So you were not concerned with the etiology at the outset, correct?

A. I guess that's one factor that's in the back of your mind. If there's something that the patient comes to you with a problem, and you are able to find a reasonable etiology and that is avoidable in the future, I guess it's appropriate to at least suggest avoiding exposure to that problem at issue.

Q. So although you weren't really focused on the etiology, your concern was just avoiding possible future causes of problems, correct?

A. Yes.

Q. You weren't focused on determining whether or not it was an actual cause, you simply wanted to make sure she avoided possible causes, correct?

A. That's correct.

*Id.* at pp. 49–50.

Having failed to "rule out" other factors for the Plaintiff's skin cancer, the Plaintiff has not established a submissible showing of causation, even if either Dr. Heath, or Dr. Martinez, had competently "ruled in" the Defendants' powdered coatings as capable of causing the Plaintiff's basal cell carcinoma. Of course, we do not overlook the attempt, by Plaintiff's counsel, to rehabilitate Dr. Heath's opinions, which would either increase, or diminish, his suspicions about the involvement of the Defendants' products in the Plaintiff's development of cancer, but we are not here assessing Dr. Heath's credibility, but whether he had a relevant and reliable basis for including the Defendants' products as a likely cause of the Plaintiff's skin cancer.[14] For the

---

14. Moreover, we have more than passing concern as to whether Dr. Heath held his opinions to a proper degree of medical certainty. In this respect, the doctor testified as follows:

Q: Do you have an opinion today regarding the etiology of this basal cell carcinoma?

A: It seems suspicious that skin cancer developed in a relatively younger patient, without a lot of history of sun exposure, in the same area that she had said that she had irritation from her goggles and paint accumulating in the bridge area of the nose. Based on the circumstantial evidence, it seems that it's likely to me, but—

Q: So do you hold your opinion to a reasonable degree of medical certainty that exposure to powder paint is what caused this basal cell carcinoma?

A: I guess I am basing it on circumstantial evidence, and I don't know whether that's reasonable medical certainty.

*Id.* at pp. 26–27.

In the final analysis, Dr. Heath alone would know the extent of his reasonable certainty in the conclusions he has expressed, and our rulings, on the *Daubert* issues, are predicated solely on the failure of the doctor to conduct a

foregoing reasons, we conclude that the doctor had no competent basis to either "rule in," or "rule out," the Defendants' products, and therefore, the Defendants are entitled to Summary Judgment.

NOW, THEREFORE, It is—

ORDERED:

1. That the Defendants' Motions for Summary Judgment [Docket Nos. 21 and 25] are GRANTED.

2. That the Plaintiff's Motion to Expand the Summary Judgment Record [Docket No. 45] is GRANTED.

3. That the Clerk of Court is directed to record that the Motion of the Defendant Tiger Drylac U.S.A., Inc., for Rule 11 Sanctions [Docket No. 36], has been withdrawn.

4. That the Clerk of Court is directed to enter judgment in favor of the Defendants.

medically appropriate differential diagnosis as to the cause of the Plaintiff's basal cell carcinoma.